Dr. James J. SALMEN, et al, Appellants,

v.

CITY OF ST. PAUL, et al, Respondents,

Dr. James J. SALMEN, as Parent and Natural Guardian of Charles W. Salmen, a Minor, Appellant,

v.

Julia SALMEN, Respondent,

City of St. Paul and Albert Shantos, Respondents.

No. 49048.

Supreme Court of Minnesota.

May 18, 1979.

Leonard & Weinblatt and Richard E. Leonard, St. Paul, Kueppers, Kueppers Von Feldt & Salmen and T. Jay Salmen, St. Paul, for Dr. James J. Salmen et al.

Suzanne E. Flinsch, City Atty., and Edward P. Starr, Asst. City Atty., St. Paul, for City of St. Paul and Shantos.

Murnane, Murnane, Conlin & White and Lawrence R. King, St. Paul, for respondents.

Heard before ROGOSHESKE, KELLY, and SCOTT, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This matter consists of appeals by Dr. James and Mrs. Julia Salmen, husband and wife, and Dr. James Salmen as parent and natural guardian of Charles Salmen, from the judgment of the Ramsey County District Court in actions brought as a result of a motor vehicle accident involving an automobile owned and operated by Mrs. Salmen and a truck owned by the City of St. Paul and operated by Andrew Shantos. Separate actions were commenced below [1] which were then consolidated and tried to a jury. The jury found that Julia Salmen was 100 percent negligent, and awarded damages of $6,800 to Dr. James Salmen as parent and guardian of Charles Salmen. We affirm.

The accident giving rise to these actions occurred in the late morning hours of June 23, 1975, at the intersection of Sibley Street and Shepard (or Warner) Road in St. Paul, Minnesota. It was a warm, sunny day and Mrs. Salmen and her two sons, Charles and Andrew, were returning from their summer cottage on the St. Croix River to their home in St. Paul. They were traveling in a westerly direction on Warner Road. Mrs. Salmen was driving her green 1965 or '66 Nova, Charles was in the front passenger seat, and Andrew was in the rear seat. At approximately this same time, Andrew Shantos was traveling in an easterly direction on Shepard Road, driving a large city dump truck. The accident occurred when Mr. Shantos was turning off Shepard Road onto Sibley Street.

Testimony at trial revealed that this is a "T" intersection. It is formed by a road running parallel to the Mississippi River in an east/west direction and Sibley Street, a one-way street going north. That portion of the east/west road east of Sibley is referred to as Warner Road. West of Sibley, the same road is referred to as Shepard Road. Warner Road consists of two lanes for eastbound traffic and two lanes for westbound traffic, divided by a cement median. Shepard Road is similarly a four-lane road, but branches into five lanes prior to reaching Sibley Street. Three of these five lanes are for eastbound traffic. Of these three lanes, one is for left turns only, one is

---

1. Mrs. Julia Salmen and her husband Dr. James Salmen had sued the City of St. Paul and the truck driver, Andrew Shantos. Dr. James Salmen, as parent and natural guardian of Charles Salmen, had commenced an action against Julia Salmen, the City of St. Paul, and Andrew Shantos.

for left turns or non-turning traffic, and one is for through traffic.[2]

The intersection where the accident occurred is controlled by a series of five traffic lights. For purposes of this appeal, the crucial signal is the one located on the center median, on the Warner Road side of Sibley Street. That light displays traffic signals both eastward and westward. Its display sequence was explained at trial by a traffic signal engineer employed by the City of St. Paul. He explained that the face of the signal showing to eastbound traffic has only two sequences—it would display either a green ball[3] or a green ball and a green arrow (it never shows red or amber). To westbound traffic, the signal displays the traditional green, amber, and red sequences. He further testified that on June 23, 1975, the timing sequence was as follows: first both east and west faces would show green balls; second, the amber ball would light on the face visible to westbound traffic for 3.3 seconds; third, the green arrow would light on the face visible to eastbound traffic and at the same time the red ball would light on the face visible to westbound traffic for 16.5 seconds; and

finally, 2.75 seconds after the green arrow went off, the red ball visible to westbound traffic would be replaced by a green ball. There was no testimony as to how long both green balls would show before the sequence repeated itself.

The Salmens' westbound vehicle struck the city truck as the truck was turning from the eastbound center lane of Shepard Road north onto Sibley Street. There were five eyewitnesses to this accident; their testimony, however, conflicts materially.

Defendant Shantos has been a St. Paul city truck driver for over 20 years. On June 23, 1975, he was driving east on Shepard Road after dumping a load of diseased elm logs in Eden Prarie. He testified that as he approached the intersection with Sibley he was in the middle eastbound lane; this lane enabled him to either turn on Sibley or go straight onto Warner Road. He claims that 40 or 50 feet before he reached the intersection the green arrow came on. He testified that he entered the intersection on the green arrow, going 10 or 15 miles an hour, and immediately stopped because he saw the Salmen vehicle ap-

**2.** Below is a portion of a diagram contained in the record.

**3.** A printed sign attached to the signal warned that left turns on the green ball had to yield to oncoming traffic.

proaching. He was then struck by the Salmen vehicle.

Shantos' testimony was corroborated by that of Roy Cobb, a truck driver for the post office. Cobb was situated in the left-turn-only lane of Shepard at the time of the collision. He testified that he stopped at Sibley to wait for the green arrow. He further testified that the arrow appeared but that he had to wait because three more westbound cars were entering or approaching the intersection. As he sat there, the city truck entered the intersection and was struck by Mrs. Salmen's vehicle. Cobb testified that the green arrow had first come on before Shantos entered the intersection, and that Mrs. Salmen was apparently "sneaking" through the intersection after the light had changed.

Mrs. Salmen's case rested primarily on the testimony of her two sons and the driver of a car about 40 to 60 feet behind the city truck.[4] Charles and Andrew Salmen both testified that the light was green when their mother entered the intersection. This was corroborated by Jeffrey Witt, the driver of the car to the rear of the city truck. Plaintiffs also called Clyde White, a railroad engineer. At the time of the accident he was seated in his train on a hill approximately 30–40 feet above the accident site. Although he did not witness the accident, he testified that he did observe a westbound car go through the intersection immediately after the accident.

Both Mrs. Salmen and Charles received serious injuries as a result of the accident. Mrs. Salmen was rendered unconscious by the impact and had to be cut out of her automobile. She was hospitalized for 53 days as a result of injuries to her hip, left arm, head, and both knees. Both her arm and hip suffer a permanent partial disability. Charles spent 15 days in the hospital for treatment of a compression fracture to his back and cracked ribs. In the opinion of his doctors, he retains a 15 percent permanent disability to his back.

The issues for determination are:

(1) Does the evidence support the jury's findings on the negligence questions?

(2) Was the jury adequately instructed as to the rules of right-of-way?

(3) Is the award of $6,800 in damages to Dr. James Salmen as parent and guardian of Charles Salmen insufficient and a result of passion and prejudice?

■ 1. By its answers to the special interrogatories, the jury found that defendant Shantos was not negligent at or immediately prior to the accident. Further, the jury determined that Mrs. Salmen was negligent and that her negligence was a 100 percent cause of the accident. Mrs. Salmen argues that this verdict is unsupported by the evidence and perverse. In reviewing a jury verdict on appeal, this court must consider the evidence in the light most favorable to the prevailing party. *Kuehl v. National Tea Co.*, 310 Minn. 48, 245 N.W.2d 235 (1976). In so doing the verdict must be sustained unless it is manifestly and palpably contrary to that evidence. *Hakala v. Megarry Bros.*, 309 Minn. 561, 244 N.W.2d 156 (1976).

■ As is apparent by its answers to the special interrogatories, the jury necessarily determined that Shantos permissibly entered the intersection on a green arrow and that the Salmen vehicle entered the intersection against a red light.[5] As shown previously, the evidence at trial squarely conflicted on this point, raising a fact question to be decided by the jury. Considering the entire record in a light most favorable to the prevailing party, this finding is not "manifestly and palpably contrary to the evidence."

■ Defendant Shantos and Roy Cobb each testified that Shantos began his turn shortly after the green arrow came on, necessarily implying that Mrs. Salmen entered

---

4. Mrs. Salmen had no recollection of the accident or the events immediately preceding or following it.

5. No other resolution of this disputed fact question would have resulted in a finding that Julia Salmen was 100 percent at fault for the collision.

the intersection on a red light. It was not unreasonable for the jury to accept this testimony. Of all the eyewitnesses to the accident, Cobb was in the best position to observe the traffic signal at the time of the impact. He was seated directly in front of both the traffic light and the impact site. His vision was in no way obscured, and he had been focusing on the traffic signal himself, waiting for the green arrow. His testimony was very probative of the fact that Mrs. Salmen went through a red light. Based on this, the jury could reasonably find her negligent and responsible for the accident.[6] Consequently there is no merit to Mrs. Salmen's claim that the verdict is not supported by the evidence.

■ 2. Mrs. Salmen next argues that the trial court failed to fully and completely instruct the jury on defendant's duty to yield the right-of-way in making a left turn. The trial court instructed the jury on the basis of the right-of-way rules contained in Minn.St. 169.06, subd. 5. That statute relates to traffic-control signals and provides, in part, as follows:

"Whenever traffic is controlled by traffic-control signals exhibiting different colored lights, or colored lighted arrows, successively one at a time or in combination, only the colors Green, Red, and Yellow shall be used, except for special pedestrian signals carrying a word legend, and said lights shall indicate and apply to drivers of vehicles and pedestrians as follows:

(a) Green indication:

(1) Vehicular traffic facing a circular green signal may proceed straight through or turn right or left unless a sign at such place prohibits either such turn.

But vehicular traffic, including vehicles turning right or left, shall yield the right of way to other vehicles and to pedestrians lawfully within the intersection or adjacent crosswalk at the time such signal is exhibited.

(2) Vehicular traffic facing a green arrow signal, shown alone or in combination with another indication, may cautiously enter the intersection only to make the movement indicated by such arrow, or such other movement as is permitted by other indications shown at the same time. Such vehicular traffic shall yield the right of way to pedestrians lawfully within an adjacent crosswalk and to other traffic lawfully using the the intersection.

Mrs. Salmen argues that the court should also have instructed on the basis of Minn.St. 169.20, subd. 2. That statute provides in general terms that:

"The driver of a vehicle intending to turn to the left within an intersection or into an alley, private road, or driveway shall yield the right of way to any vehicle approaching from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard."

Although we agree that the instruction could have been given, we find for the reasons stated below that this did not constitute error.

■ At trial, Mrs. Salmen alleged and accordingly attempted to prove that Shantos turned in front of her as she entered the intersection on a green light. Consistent with her theory of the case, the right-of-way rule of Minn.St. 169.20, subd. 2, would apply.[7] The jury, however, determined that defendant Shantos was turning on the

---

**6.** Of course, the fact that Mr. Shantos entered the intersection on a green arrow does not preclude the jury from finding him negligent and a cause of the accident. See, *Sonntag v. Adkinson*, 251 Minn. 328, 87 N.W.2d 845 (1958). Even when proceeding with a traffic signal, "[t]he duty to use due care still prevails." *Id.*, at 333, 87 N.W.2d at 848 (footnote omitted). See, generally, 3 Blashfield, Automobile Law and Practice, § 114.42 (3 ed.). Here, however, there was testimony that Shantos entered the intersection at a slow speed and

maintained a lookout. Thus, the finding of no negligence on his part is not perverse.

**7.** Contrary to defendants' contention it would appear that, if the facts were as urged by plaintiff, both Minn.St. 169.06, subd. 5(a)(1), and Minn.St. 169.20, subd. 2, would be applicable. Indeed, 169.20, subd. 2, does not limit its effect to uncontrolled intersections and thus we would have to give effect to its terms in that situation.

green arrow, not the circular green ball, and that Mrs. Salmen had entered the intersection against the red light. In that the jury resolved the facts against Mrs. Salmen, the applicable right-of-way rules are those contained in Minn.St. 169.06, subd. 5(a)(2).[8] Thus, the trial court's failure to give plaintiff's requested instruction in no way prejudiced her case. Accordingly, she is not now entitled to relief.

■ 3. Plaintiff Dr. James Salmen, as parent and natural guardian of Charles Salmen, argues that the jury's award of $6,800 is wholly inadequate and could only have been given under the influence of passion or prejudice. Plaintiff raised this claim before the trial court by motion for additur or, in the alternative, for a new trial, and was denied relief. This court has repeatedly stated that it will not reverse the trial court's determination of the adequacy of the verdict unless there is a clear abuse of discretion. *Hagen v. Swenson*, 306 Minn. 527, 236 N.W.2d 161 (1975); *Ramfjord v. Sullivan*, 301 Minn. 238, 222 N.W.2d 541 (1974). Applying this standard, plaintiff's claim, although presenting a close question, must fail.

■ We do not doubt that Charles Salmen's injuries were real and substantial. The record shows that he received several cracked ribs and compression fractures of two vertebrae. He was hospitalized for 15 days, during the first 8 of which he remained completely stationary on his back. He was in considerable pain throughout that period. For a period following the accident, he could only walk with the aid of a walker. Throughout the summer following the accident, Charles had to wear a back brace, and he continues to use this periodically. Two doctors testified that Charles has a 15-percent permanent disability of his back as a result of the collision. Defendants did not dispute these medical findings. The evidence showed that from

June 23, 1975, until trial Charles' medical bills amounted to $1,328.15 and that he incurred $850 of wage loss in the summer of the accident.

At trial, Charles testified that as a result of these injuries he has had to restrict his participation in some of the activities he engaged in prior to the accident. He testified that he can no longer water ski or do strenuous yoga exercises. He also testified that it is difficult for him to sit for longer than four or five minutes in a position where his back is unsupported. He related that this causes him difficulty in his schoolwork. Charles also testified that he now has difficulty snow skiing, swimming and hiking.

On cross-examination, however, the defense established that Charles' recovery has been quite good. Charles testified on cross-examination that during each of the two summers following the accident he was employed as a lifeguard by the City of St. Paul. He testified that, in order to qualify for the necessary life-saving certificate, he was required to demonstrate that he was able to rescue adult drowning victims from a pool. He further testified that he continues to play soccer, jog, and play water polo, as well as to ski, hike, and backpack.

The trial court specifically instructed the jury that Charles was not negligent and that he was not to be charged with any of his mother's negligence, if in fact the jury determined that she was negligent. The jury was further instructed that Charles could recover for any pain, disability, disfigurement, embarrassment or emotional distress resulting from the accident, both up to the time of trial and that which was reasonably certain to continue into the future. Based on this evidence and these instructions, the jury returned a verdict of $6,800 damages to Charles.

8. Application of Minn.St. 169.20, subd. 2, in a situation where the left-turning driver was proceeding on a green arrow and the nonturning driver was entering the intersection on a red light would have the absurd result of giving the "privilege of immediate use" to the driver faced with a red light. We may presume that, "[t]he legislature does not intend a result that is absurd * * *." Minn.St. 645.17(1). See, also, *State v. Fleming*, 302 Minn. 61, 223 N.W.2d 397 (1974).

In arguing that these damages are inadequate, plaintiff relies principally on *Walser v. Vinge*, 275 Minn. 230, 146 N.W.2d 537 (1966); *Stacy v. Goff*, 241 Minn. 301, 62 N.W.2d 920 (1954); *Blacktin v. McCarthy*, 231 Minn. 303, 42 N.W.2d 818 (1950); and *Olson v. Christiansen*, 230 Minn. 198, 41 N.W.2d 248 (1950). These cases, however, do little to further plaintiff's claim. In each case, the plaintiff's recovery was equal to or less than his special damages and wage loss. These cases are inapposite because here plaintiff received an award which exceeded his stipulated wage loss and medical bills by $4,600. Thus, clearly, a substantial sum was awarded for his general damages.

Plaintiff also argues that the jury was prejudiced against him because he was the defendant's son and testified for her on the liability aspect of her case. The court's instructions, however, would indicate that this was not the case. The court was careful to point out that Charles should not be charged with his mother's negligence and that any recovery was solely for his own benefit. Although the award is substantially less than that sought by plaintiff, this seems to be more a consequence of his favorable recovery than passion or prejudice on the jury's part. The trial court therefore acted within its discretion in denying plaintiff's motions for additur or a new trial.

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.