STATE of Minnesota, Respondent,

v.

John Patrick MURPHY, Petitioner, Appellant.

No. C3–94–1931.

Supreme Court of Minnesota.

April 12, 1996.

John M. Stuart, State Public Defender, Evan W. Jones, Asst. State Public Defender, Minneapolis, for Appellant.

John P. Murphy, Stillwater, pro se.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., Michael Richardson, Asst. County Atty., Minneapolis, for Respondent.

## OPINION

PER CURIAM.

Defendant, John Patrick Murphy, was charged with terroristic threats, conspiracy to commit terroristic threats, criminal damage to property, and burglary. Before trial, Murphy pleaded guilty to ten counts of terroristic threats and one count of conspiracy to commit terroristic threats. He was sentenced to 96 months in prison and 450 months of probation. As a condition of probation, Murphy was ordered to serve his probation outside of the states of Minnesota and Wisconsin, or in the alternative, outside of a radius from the border of Minneapolis and St. Paul at the Mississippi River, for a distance of 150 miles.

Following imposition of sentence from the acceptance of his guilty plea, Murphy appealed. The Minnesota Court of Appeals affirmed the district court's acceptance of Murphy's plea to terroristic threats and the sentence imposed. Murphy appeals to this court, maintaining that his conduct did not constitute terroristic threats, the length of his sentence was an abuse of discretion, and the condition of probation constitutes banishment and is thus prohibited by Minnesota law. We conclude that Murphy's conduct constitutes terroristic threats, affirm the district court's imposition of a 96-month sentence, but we do not reach the issue of Murphy's condition of probation because this issue is not ripe for appellate review.

Murphy was charged in a 34-count complaint for what the state has referred to as a "campaign of terror" against persons in the criminal justice system. Murphy's conduct was directed against those persons who have taken action adverse to him in criminal cases in which he was the defendant. Those subject to Murphy's conduct include judges, prosecutors, witnesses, co-defendants, police, state and federal probation employees, and halfway house employees. The nature of Murphy's conduct extends from the heinous to the puerile, including placing dead animals and animal parts—birds, cats, rabbits, deer, and squirrels—at his victims' houses; planting fake bombs; dumping oil and blood on houses; spraypainting epithets and obscenities such as "slut whore," "slut bitch," and "fag, queer, homo," as well as messages such as "I'll come back," "I be back," and "I will be back," on houses and garages; puncturing over 150 tires, breaking car windows, "keying" or scratching cars and damaging car interiors; cutting telephone wires; throwing rocks, bricks, concrete chunks, beer and pop cans and other objects through windows; egging houses and garages; placing broken beer bottles in front of a garage; and calling in fictitious pizza orders and placing fictitious want ads. The conduct alleged in the complaint took place in Ramsey and Dakota Counties and was often committed by stealth under the cover of darkness.

The matter was set for trial in Ramsey County. But, because many of Murphy's victims were employees in the Ramsey County court system, the case was transferred to Hennepin County and a judge from the Fifth Judicial District was assigned to hear the case pursuant to Minn.Stat. § 2.724, subd. 1 (1994). Based on the conduct alleged in the complaint, Murphy faced a potential prison sentence of over 168 years. On April 18, 1994, Murphy pleaded guilty and the court imposed a 96-month executed sentence, together with 450 months probation. The state and Murphy's victims objected to the sentence as being too lenient.

As part of his plea agreement, Murphy admitted to the allegations in the criminal complaint. These allegations reveal that Murphy's conduct began as early as 1978 and continued into 1993. Murphy's victims include three Ramsey County district court judges, two Ramsey County attorneys, a St. Paul city prosecutor, a Ramsey County probation officer, a Department of Corrections employee, a federal probation officer and her neighbor, and two halfway house employees. The record contains a comprehensive portrayal of Murphy's conduct and its effect upon his victims. A complete recounting of Murphy's conduct would be protracted and is not necessary for the disposition of this appeal. The experience of three of Murphy's victims, while hardly doing justice to the extent of fear and apprehension caused by Murphy, does convey the breadth, depth and nature of Murphy's conduct.

One such victim is the Ramsey County judge who presided over a 1985 fifth-degree assault case against Murphy and sentenced him to 90 days in the workhouse. In November 1985, three months after being released from the workhouse, Murphy punctured eight tires on two vehicles parked at the judge's home. He also spraypainted the judge's house, garage, and storage shed in red, and left the ominous message, "I will be back." In January 1986, Murphy did as he had threatened and returned to the judge's home, spraypainting the judge's garage in black and left the message, "I'll be back." In August 1988, Murphy again did as he threatened, returning to the judge's home, leaving a bomb-like package for which the bomb squad had to be called.

Murphy's harassment of the judge continued even while he was in prison, using the prison telephone and the U.S. mail to accomplish what he could no longer do on the outside. In October 1988, while in jail awaiting sentencing on a conviction for state income tax fraud, Murphy placed a false newspaper ad for a room to rent at the judge's home, leading to at least a dozen telephone inquiries. In March 1989, Murphy struck again, placing two false newspaper ads for a room to rent and a garage sale. In November 1989, Murphy placed two newspaper ads announcing an estate sale under the name of the co-owner of the judge's home. In May 1991, Murphy sent two unordered pizzas to the judge's home. In June 1991, after he was released from prison, Murphy made several prank telephone calls to the judge at the judge's office and home.

In November 1992, Murphy's harassment turned sanguinary. He went to the judge's home and placed a dead squirrel with its tail cut off in the driveway; four legs of a deer in front of the garage; a dead rabbit near the driveway; another dead squirrel near the rabbit; and another dead squirrel in a large brown envelope in the mailbox. In December 1992, Murphy had an unordered pizza delivered to the judge's home. In January 1993, Murphy placed a second fake bomb in the judge's mailbox. The bomb squad was again called to the judge's home, where they examined the box by x-ray and determined that the bomb was fake. The judge told police investigators that prior to conducting Murphy's trial, the judge had not experienced any similar acts of vandalism or terrorism.

The experience of a St. Paul city prosecutor also typifies the protracted harassment, vandalism, and terrorism to which Murphy subjected his victims. In May 1984, the prosecutor successfully prosecuted Murphy on the charge of fifth-degree assault. Two years later, the prosecutor charged Murphy with trespassing at the home of the assault victim in the 1984 case. In June 1986, Murphy pleaded guilty to this new charge and served 25 days in jail. In April 1987, the prosecutor began probation violation proceedings against Murphy because of Murphy's continued harassment of his assault victim, her neighbor, and two Ramsey County judges.

In August 1987, Murphy commenced a campaign of retaliation against the prosecutor. Murphy reported the prosecutor to the Minnesota Lawyer's Professional Responsibility Board on several baseless charges. Two months later, Murphy went to the prosecutor's home and punctured all four tires on the prosecutor's car. Murphy subsequently returned to the prosecutor's home on several occasions to puncture car tires, after which

the prosecutor moved from Minneapolis [1] to White Bear Lake, Minnesota, located in Ramsey County.

Four years later, the attacks against the prosecutor resumed. In October 1992, Murphy again punctured all four tires on the prosecutor's car. In November 1992, he once again punctured the tires of the prosecutor's car, but this time he also "keyed" or scratched the body panels of the car and threw dead animals and animal parts in the yard. Murphy's last attack against the prosecutor took place in January 1993, when he once again punctured the tires of the prosecutor's car. The prosecutor told police investigators that there were no similar acts of terrorism and vandalism prior to the prosecutor's involvement in the prosecution of Murphy.

Another of Murphy's victims is the director of a halfway house who, after being verbally and physically threatened by Murphy, recommended that Murphy's probation be revoked. On February 22, 1991, after his probation was revoked, Murphy returned to Stillwater Prison for incarceration. In retaliation, Murphy began calling the director at home and at work, using a phony accent and saying "hey bitch" or "you bitch" or "hey bitch, I know where you live." Murphy was released from prison in June 1991.

On the night of February 22, 1992, the anniversary of his return to Stillwater Prison, he went to the halfway house director's home and punctured eight car tires. The next day, Murphy called the director at the halfway house and said, "Hey bitch, did you like what I did to your car?" In September 1992, Murphy threw a concrete chunk through the kitchen window and another concrete chunk through a second story bedroom window of the director's home. The halfway house director told police investigators that prior to her contact with Murphy, she had not experienced similar acts of vandalism or terrorism.

Based on his conduct against these three victims and several others, Murphy pleaded guilty and was convicted of ten counts of terroristic threats and one count of conspiracy to commit terroristic threats. At the sentencing hearing, Murphy received executed sentences totalling 96 months (8 years) incarceration and 450 months (37.5 years) of probation. Murphy's 96-month sentence was an upward durational departure from the sentencing guidelines. As a condition of probation, Murphy was ordered to serve his probation outside of the states of Minnesota and Wisconsin, or in the alternative, outside of a radius from the border of Minneapolis and St. Paul, Minnesota, at the Mississippi River, for a distance of 150 miles. Murphy appealed to the court of appeals, arguing that his conduct did not constitute terroristic threats and objecting to his sentencing and conditions of probation. The court of appeals affirmed Murphy's conviction, sentence, and condition of probation.

## I.

Murphy first argues that his underlying criminal conduct cannot properly be construed as threats to commit crimes of violence under Minn.Stat. § 609.713, subd. 1 because the statute prohibits only verbal threats. Murphy also contends that under the statute, the threat must be to commit a "crime of violence" within the meaning of "violent crime" in Minn.Stat. § 609.152, subd. 1(d). The court of appeals concluded that Murphy's conduct constituted terroristic threats under the statute.

Whether a statute has been properly construed is a question of law to be reviewed de novo by this court. *Hibbing Educ. Ass'n v. Public Employment Relations Bd.,* 369 N.W.2d 527, 529 (Minn.1985). Minnesota Statutes section 609.713, subd. 1 (1992) provides that "[w]hoever threatens, directly or indirectly, to commit any crime of violence with purpose to terrorize another" is guilty of terroristic threats. The statute on its face places no restriction on the word "threatens" that would limit the statute's scope to the spoken word.[2] However, Murphy urges us

---

1. The acts which took place at the prosecutor's home in Minneapolis, located in Hennepin County, were listed in the complaint, but not charged against Murphy.

2. Cf. Minn.Stat. § 609.715, subd. 2: "Whoever *communicates* to another * * * that explosives or an explosive device or any incendiary device is present at a named place or location * * * may

to consider *State v. Schweppe*, in which this court used terms such as "declaration," "words or phrases," "statement," and "utter" in describing the essential elements of the crime of terroristic threats:

> A threat is a *declaration* of an intention to injure another or his property by some unlawful act. The test of whether *words* or *phrases* are harmless or threatening is the context in which they are used. Thus, the question of whether a given *statement* is a threat turns on whether the "communication 'in its context' would 'have a reasonable tendency to create apprehension that its originator will act according to its tenor.'" * * * Section 609.713, subd. 1, requires that defendant *utter* the threat with the purpose of terrorizing another. Purpose in this context means aim, objective or intention. Terrorize means to cause extreme fear by use of violence or threats.

306 Minn. 395, 399–400, 237 N.W.2d 609, 613–14 (1975) (citations omitted) (emphasis added).

Because *Schweppe* uses terms such as "declaration," "words or phrases," "statement," and "utter," Murphy narrowly reads Minn.Stat. § 609.713, subd. 1 to prohibit only spoken or written threats. Murphy's argument is plausible at first blush, for terms such as "words or phrases" or "utter" can only be applied to spoken or written threats. But *Schweppe* must not be read so narrowly, for the issue in *Schweppe* centered on spoken threats to kill the victim; physical acts were not considered by that court. 306 Minn. at 400, 237 N.W.2d at 614. The question of whether *physical acts* alone constitute terroristic threats is an issue of first impression before this court. While we have not addressed this precise issue, we note that the court of appeals has previously upheld convictions where oral or written threats were accompanied by a physical threats. *See, e.g.*

*State v. Fischer*, 354 N.W.2d 29, 34 (Minn. App.1984) (threatening by telephone to kill people while discharging firearms); *State v. Lavastida*, 366 N.W.2d 677, 679 (Minn.App. 1985) (writing note threatening to kill victim and pointing finger at victim and drawing it across throat).

While Murphy focuses on terms in *Schweppe* such as "declaration" or "utter," the crucial phrase from that opinion is whether the "communication in its context would have a reasonable tendency to create apprehension that its originator will act according to its tenor." *Schweppe*, 306 Minn. at 399, 237 N.W.2d at 613. Many physical acts considered in context communicate a terroristic threat. We may find our examples in the case law, such as drawing a finger across one's throat or discharging a firearm over the telephone, *see Fischer, Lavastida;* in the movies, such as boiling a rabbit on the stove in the tranquil setting of former paramour's new family home, or placing a severed horse's head in a bed; or as here, depositing dead animals at a residence or planting a fake bomb. Life is replete with such examples, and whatever the source, the principle is the same: physical acts communicate a threat that its "originator will act according to its tenor." *Schweppe*, 306 Minn. at 399, 237 N.W.2d at 613. Other state courts similarly have held that physical acts may communicate a terroristic threat. *See State v. Miller*, 6 Kan.App.2d 432, 629 P.2d 748, 749 (1981) (holding that burning a wooden cross on the driveway of a prosecutor's residence constituted a communication of a terroristic threat prohibited by statute). Like the burning of a cross, any of a number of Murphy's acts terrorized his victims and left a message that he was capable of coming back and doing something more serious. *See id.* 629 P.2d at 750. Slashed tires, dead animal parts, fake bombs, rocks thrown

---

be sentenced to imprisonment for not more than three years" (emphasis added), and subd. 3(a): "Whoever *displays, exhibits, brandishes,* or otherwise *employs* a replica firearm or a BB gun in a threatening manner, may be sentenced to imprisonment * * *." (emphasis added). The verb "communicate" in subd. 2 suggests that the legislature had in mind written or spoken communication, as would be typical with a bomb threat.

The verbs "display," "exhibit," "brandish," and "employ" in subd. 3 exclusively denote physical acts. In comparison, subd. 1 contains no verbs of limitation, suggesting that the legislature intended subd. 1 to encompass both physical acts and oral or written threats. Otherwise, the legislature could have written in a limiting verb as it did with subds. 2 and 3.

through windows, and other physical acts are all indices that future, more serious acts of violence may follow. Even Murphy admitted at sentencing that each of his individual acts was undertaken with the understanding that he might come back again and that his intent was to scare and terrorize his victims.

▮ We also reject Murphy's interpretation of the terroristic threats statute because limiting the reach of the statute to oral or written threats would lead to an absurd result. It would allow one to terrorize another if the terrorist were clever enough to make threats without recourse to the spoken or written word. It is well settled that courts may presume that the legislature does not intend an absurd result. Minn.Stat. § 645.17(1) (1994); *see also Salmen v. City of St. Paul*, 281 N.W.2d 355, 361 n. 8 (Minn. 1979). Moreover, courts should give a reasonable and sensible construction to criminal statutes. *State v. Suess*, 236 Minn. 174, 183, 52 N.W.2d 409, 415 (1952). In choosing between possible definitions of a statutory term, courts must accept the interpretation which is more logical and practical. *See Industrial Rubber Applicators, Inc. v. Eaton Metal Prods. Co.*, 285 Minn. 511, 515, 171 N.W.2d 728, 732 (1969). Because a "physical act" exception to Minn.Stat. § 609.713, subd. 1 would create the anomalous situation of barring the prosecution of a terrorist who communicates a threat by a physical act, but not the spoken or written word, we hold that physical acts which communicate a threat, as well as oral and written threats, fall within the ambit of that subdivision.

## II.

Murphy also argues that his actions do not constitute a threat to commit a "crime of violence." The terroristic threats statute states that the term "crime of violence" has the meaning given "violent crime" in Minn. Stat. § 609.152, subd. 1(d). This statute lists various crimes to the person, such as murder, manslaughter, assault, robbery, kidnapping, false imprisonment, rape, etc. Murphy argues that although he may have intended to harass and scare his victims, he neither threatened to injure them nor in fact injured them. Accordingly, his conduct should constitute nothing more than criminal damage to property.

▮ Murphy's interpretation lacks merit. The terroristic threats statute mandates that the threats must be to commit a *future* crime of violence which would terrorize a victim. It is the future act threatened, as well as the underlying act constituting the threat, that the statute is designed to deter and punish. Based on this interpretation of the statute, Murphy's acts of terrorism clearly involved threats to commit future acts of physical violence. To take just one example, leaving parts of dead animals on the property of victims does not induce the fear of future acts of littering or cruelty to animals; it conveys a threat to injure, kill, or commit some other future crime against the person. The victims' testimony in the sentencing hearing manifests the pervasive and deep-seated fear that Murphy's conduct created in their lives. Murphy's conduct undeniably created an overwhelming "apprehension that its originator will act according to its tenor" and commit a future act of physical violence. *See Schweppe*, 306 Minn. at 399, 237 N.W.2d at 613. Murphy's conduct also sent a clear message that he was "capable of coming back later and doing something more serious." *Miller*, 629 P.2d at 750. We therefore hold that Murphy's acts were threats to commit future acts of physical violence under Minn. Stat. § 609.713, subd. 1.

## III.

▮ Murphy contends that the district court abused its discretion by departing from the sentencing guidelines and imposing a 96-month sentence. Murphy further asserts that the sentences imposed for each charge to which he pleaded guilty are the statutory maximums, in violation of the *Evans* rule. Murphy also argues that the district court incorrectly used the *Hernandez* method of sentencing, thereby increasing the number of points in his criminal history score, while imposing consecutive sentences. The district court has great discretion in the imposition of a sentence and the reviewing court cannot substitute its judgment for that of the district court. *Steeves v. State*, 287 Minn. 476, 480, 178 N.W.2d 723, 725 (1970). Generally,

the purposes of the sentencing guidelines will not be served unless the district court applies the presumptive sentences. *State v. Garcia*, 302 N.W.2d 643, 647 (Minn.1981). The district court has discretion to depart from the presumptive guidelines sentence only if there are aggravating or mitigating factors present. *State v. Best*, 449 N.W.2d 426, 427 (Minn.1989).

Under the *Evans* rule, when aggravating circumstances are present, the upper limit on a durational departure is double the sentencing guidelines maximum presumptive sentence duration. *State v. Evans*, 311 N.W.2d 481, 483 (Minn.1981). But when the aggravating circumstances are severe, the doubling limit of *Evans* does not apply. *State v. Stumm*, 312 N.W.2d 248, 249 (Minn. 1981). Whether severe aggravating circumstances are present is a decision which, "[i]n the final analysis * * * must be based on our collective, collegial experience in reviewing a large number of criminal appeals from all the judicial districts." *State v. Norton*, 328 N.W.2d 142, 146–47 (Minn.1982).

The district court listed several reasons for upward departure, including that Murphy's conduct took place over a ten-year period, involved multiple victims, was committed by guile and concealment in the night, was committed at victims' homes and was thus an invasion of privacy and security, and evinced the likelihood of repetitive behavior. Viewed as a whole, we conclude that these severe aggravating factors were sufficient to justify imposing a sentence more than two times the presumptive sentence established by the sentencing guidelines.

Murphy also argues that the district court incorrectly used the *Hernandez* method of calculating his criminal history score, while imposing consecutive sentences. Under the *Hernandez* method, the district court, in sentencing a defendant on the same day for multiple offenses that were not part of a single behavioral incident and that occurred at different times and involved different victims, may properly assign one point for each felony conviction for which a sentence was stayed or imposed before the sentencing for the offense in question. *State v.*

*Hernandez*, 311 N.W.2d 478 (Minn.1981). Consecutive sentencing, however, cannot be used in conjunction with the *Hernandez* method. *State v. Anderson*, 345 N.W.2d 764, 766 (Minn.1984). In this case, the district court imposed consecutive sentencing in conjunction with the *Hernandez* method. However, because the court did not rely on Murphy's criminal history score in departing from the sentencing guidelines, we conclude that the error was harmless and cannot serve as a basis for reversal.

## IV.

Murphy argues that the condition of probation under which he serve his probation outside of the states of Minnesota or Wisconsin constitutes banishment and is thus prohibited by Minnesota law. Murphy also asserts that the alternative probationary condition banning him from "outside of a radius from the border of Minneapolis and St. Paul, Minnesota, at the Mississippi River, for a distance of 150 miles" is similarly void.

The first question before us is whether the issue of Murphy's condition of probation is ripe for review. It is well settled that "on appeal there must be a substantial and real controversy between the parties before a case will be considered by this court." *State v. Brown*, 216 Minn. 135, 138, 12 N.W.2d 180, 181 (1943). Our jurisprudence establishes that regardless of the proceeding involved, a justiciable controversy must exist in order for a litigant's claim to be properly before a court. *See State v. Young*, 294 N.W.2d 728, 730 (Minn.1980). In order to establish a justiciable controversy, the defendant must show a direct and imminent injury which results from the alleged unconstitutional probationary provision. *State v. Colsch*, 284 N.W.2d 839, 841 (Minn.1979). Issues which have no existence other than in the realm of the future are "purely hypothetical and are not justiciable. Neither the ripe nor the ripening seeds of controversy are present." *Lee v. Delmont*, 228 Minn. 101, 110, 36 N.W.2d 530, 537 (1949).

We have previously declined to consider the constitutionality of conditions of probation on the grounds of ripeness. *See*

**918**

*Colsch,* 284 N.W.2d at 841–42 (refusing to consider the constitutionality of probation conditioned on defendant's consent to warrantless searches where no search occurred). Murphy is currently serving his sentence in the corrections facility at Oak Park Heights, Minnesota. Although Murphy has not been placed on probation, "banished" or otherwise removed from this state, he urges us in this appeal to consider the constitutionality of his probationary condition. Following *Colsch,* we decline to consider Murphy's probationary condition on the ground that it is speculative and not ripe for review.

The speculative nature of Murphy's argument is apparent when considering the statute under which the state plans to remove him from the state. Minnesota Statutes section 243.16 provides for out-of-state probation under only two conditions: when the person is "a resident of or has his family residing within the receiving state and can obtain employment there" or when "the receiving state consents to such a person being sent there." Minn.Stat. § 243.16. subd. 2(1)(a) (1994); *see also State ex rel. Halverson v. Young,* 278 Minn. 381, 154 N.W.2d 699, 702 (1967) (approving the imposition of out-of-state probation if undertaken pursuant to Minn.Stat. § 243.16). Neither condition can be answered until Murphy is about to be released from prison and therefore ready to be placed on probation. Because Murphy is not eligible for release for several years, we hold that his claim is prematurely raised and thus is not properly reviewable.

## V.

Murphy raises 11 separate arguments in his pro se supplemental brief, some of which are addressed above. None of the pro se arguments materially affect the outcome of this case. Murphy alleges prosecutorial vindictiveness, but that issue is waived by Murphy's guilty plea. *State v. Ford,* 397 N.W.2d 875, 878 (Minn.1986) (guilty plea operates as waiver of all nonjurisdictional defects arising prior to the entry of the plea). He argues that he was not competent to make a knowing and intelligent guilty plea due to medication he was taking. However, at sentencing the judge asked Murphy if he was currently under the care of a doctor or was taking any medication, to which he replied no. The judge also asked Murphy if he fully understood the proceedings, to which he replied yes. Murphy urges this court to consider his medical records, affixed to his pro se brief, but these records are not part of the record before this court. *See* Minn. R. Civ.App. P. 110.01. Murphy thus provides no factual support for this claim.

Murphy also alleges that his former counsel promised that Murphy would serve his sentence in North Dakota, and that property seized pursuant to a search of Murphy's house would be restored to his possession in return for a guilty plea. The record does not provide any support for this allegation. Murphy argues that the district court's order that he pay $30,000 in restitution is excessive, inappropriate and must be vacated. Murphy's plea agreement, however, contained the provision that he "make restitution in the amount of $30,000." The sentencing judge also had several factual bases on which to conclude that this dollar amount was proper, including the complaint, the presentence investigation report, and Murphy's own testimony at sentencing.

Finally, Murphy alleges that his criminal history score was computed incorrectly. We need not reach this issue because the district court did not rely on Murphy's criminal history score in departing from the sentencing guidelines.

Affirmed.