STATE of Minnesota, Respondent,

v.

Erwin Carl MORRIS, Appellant.

No. C5–99–864.

Court of Appeals of Minnesota.

April 18, 2000.

Review Denied May 23, 2000.

Mike Hatch, Attorney General, St. Paul and Susan Gaertner, Ramsey County Attorney, Darrell C. Hill, Assistant Ramsey County Attorney, St. Paul, MN (for respondent).

John M. Stuart, State Public Defender, Rochelle R. Winn, Assistant Public Defender, Minneapolis, MN (for appellant).

Considered and decided by PETERSON, Presiding Judge, SCHUMACHER, Judge, and ANDERSON, Judge.

## OPINION

PETERSON, Judge

In this appeal from the sentence imposed for his terroristic threats conviction, appellant Erwin Carl Morris argues that there are not substantial and compelling circumstances to support the trial court's durational departure decision. We affirm.

## FACTS

At about 6:00 a.m. on December 12, 1998, the St. Paul police received a call reporting a domestic incident that involved a knife and a gun. When the police arrived at the scene, Deangelo Williams told them that a man with a .22 rifle had cut him on the hand and robbed him. Williams said that the suspect, Morris, had retreated to an upstairs bedroom and closed the door. The police found a large amount of ammunition in the house but no

firearms. When the police tried to talk to Morris through the closed bedroom door, he told them that if they came in, he would shoot them and then shoot himself. After hearing two shots from a small-caliber weapon, the police retreated from the house and at about 6:30 a.m., called in the Critical Incident Response Team (CIRT).

The CIRT is a highly trained tactical team composed of 28 officers, 7 sergeants, and a lieutenant. CIRT officers are trained to deal with hostage situations and barricaded suspects. When the CIRT arrived, they set up a command post and evacuated the residents from nearby homes.

A crisis negotiator first tried to communicate with Morris by telephone, but Morris did not respond. Sometime after 9:00 a.m., two negotiators entered the house and spoke to Morris from the stairwell. During the next several hours, Morris refused to give up and repeatedly stated, "I'm not going to talk to you," "I want crack," "Bring on the body bag," "Come on, give me a head shot," and "I'm not coming out." He also said several times that he had a surprise for the officers and that if any officer were to enter the bedroom, that officer should bring two body bags. He boasted that he had military tactical training that would enable him to hold off the CIRT.

Around 1:00 p.m., after negotiations failed and Morris still refused to surrender, the CIRT shut off the electrical power and broke upstairs windows to let in cold air. Morris responded by covering the windows with mattresses. Police used fire hoses to knock down the mattresses, and Morris put them up again. The CIRT shot canisters of tear gas into the house. When the tear gas failed to draw Morris out, CIRT officers entered the house. On the first floor, they found an empty handgun box, some 30.06 rifle ammunition, some .357 cartridge casings, and a .22 rifle.

As the afternoon wore on, Lieutenant Timothy Leslie felt that the situation was beginning to seriously jeopardize public safety. The police perimeter started to break down and people appeared on nearby rooftops to watch the standoff. In response, the CIRT decided to enter the bedroom.

As the team attempted to enter the barricaded bedroom door, one of the officers ordered Morris to give up. Morris told the officer that he would not give up and that if they came into the room, he would shoot them. A CIRT officer on a roof near the bedroom window could see that Morris was beneath a blanket in the corner and was pointing what appeared to be a shotgun or rifle directly toward the door.

Fearing that members of the CIRT were in imminent danger, a sergeant gave the order to shoot Morris. A CIRT officer shot into the bedroom and Morris was wounded in the head and the left elbow. When CIRT officers entered the bedroom, they discovered that what the officer had believed was a gun barrel sticking out from under the blanket was really the grip end of a golf club.

Morris was convicted on one count of making terroristic threats in violation of Minn.Stat. § 609.713, subd. 1 (1998). A presentence investigation report recommended that Morris be sentenced to the presumptive guideline sentence of 24 months. The trial court found that severe aggravating circumstances existed and sentenced Morris to serve 60 months, the statutory maximum.

## ISSUE

Did the trial court abuse its discretion by departing from the presumptive guideline sentence and imposing a 60–month statutory-maximum sentence?

## ANALYSIS

■ A reviewing court will not interfere with the district court's decision regarding sentencing unless there has been a clear abuse of discretion. *State v. Lundberg*, 575 N.W.2d 589, 591 (Minn.App.

1998), *review denied* (Minn. May 20, 1998). The trial court may depart from the presumptive guideline sentence only if "substantial and compelling circumstances" exist. Minn. Sent. Guidelines II.D; *see also State v. Best*, 449 N.W.2d 426, 427 (Minn. 1989) (trial court has discretion to depart from presumptive sentence only if aggravating or mitigating circumstances are present). Substantial and compelling circumstances are those that make the facts of a particular case significantly more or less serious than a typical case involving the same crime. *State v. Back*, 341 N.W.2d 273, 276 (Minn.1983).

> Generally, when aggravating circumstance are present, the upper limit on a durational departure is double the Sentencing Guidelines maximum presumptive sentence duration.

*State v. Glaraton*, 425 N.W.2d 831, 834 (Minn.1988). However, severe aggravating circumstances may justify a sentence greater than double the presumptive sentence. *Id.* When severe aggravating circumstance exist, the only absolute limit on an upward departure is the statutory-maximum sentence. *Id.* But only in a "rare" case will aggravating circumstances be so severe as to justify a greater-than-double durational departure. *State v. Weaver*, 474 N.W.2d 341, 343 (Minn.1991).

> [T]here is no clear line that marks the boundary between "aggravating circumstances" justifying a double departure and "severe aggravating circumstances" justifying a greater than double departure.

*State v. Norton*, 328 N.W.2d 142, 146 (Minn.1982). Whether the circumstances justify a greater-than-double departure ultimately must be based upon "our collective, collegial experience in reviewing a large number of criminal appeals from all the judicial districts." *Id.* at 146–47.

■ Appellant argues that the trial court abused its discretion by not imposing the presumptive 24–month sentence under the sentencing guidelines. He contends that his conduct is not more serious than

the typical terroristic threats offense and that there are not substantial and compelling circumstances to support a durational departure. Appellant argues further that if there are substantial and compelling circumstances to support a sentencing departure, they are not the severe aggravating circumstances necessary to support a greater-than-double departure.

Morris was convicted of making terroristic threats in violation of Minn.Stat. § 609.713, subd. 1 (1998), which provides:

> Whoever threatens, directly or indirectly, to commit any crime of violence with purpose to terrorize another or to cause evacuation of a building, place of assembly, vehicle or facility of public transportation or otherwise to cause serious public inconvenience, or in a reckless disregard of the risk of causing such terror or inconvenience may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $10,000, or both.

The trial court determined that appellant's offense is more serious than a typical terroristic threats offense "because it involves multiple victims over a long period of time and risk to others than the immediate victims."

Morris argues that the trial court's reasons for departing are not sufficient to support the trial court's sentencing departure. He contends that the fact that there were multiple victims is not a proper basis for departing in this case because he did not determine the number of victims involved in the offense. Rather, the number of officers present was determined by the tactical decisions of the commander of the CIRT. Morris also contends that the risk of danger to others is not a proper basis for departing because any increased risk was not a direct result of his conduct, but was instead caused by police actions.

■ We do not agree that the trial court should not have considered the number of victims and the risk of danger to others simply because these factors were attribut-

able in part to the decisions and actions of police officers that responded to Morris's actions. When determining whether a defendant's conduct was more or less serious than that typically involved in the commission of the crime in question,

> generally it is proper for the sentencing court to consider the course of conduct underlying the charge for which the defendant is being sentenced.

*Back,* 341 N.W.2d at 276.

In *State v. McClay,* 310 N.W.2d 683, 685 (Minn.1981), the supreme court allowed a durational departure because

> looking at the overall course of conduct, the robbery was a more aggravated kind of armed robbery than the typical one, with defendants putting more people in fear, kidnapping one person, and assaulting several others during their escape. That is, the conduct underlying the offense was particularly serious and represented a greater than normal danger to the safety of other people.

Thus, multiple victims and a greater than normal danger to the safety of people other than the victims have both been recognized as aggravating factors that will support a durational departure.

The course of conduct underlying the terroristic threats charge against Morris included his standoff against dozens of police officers. And as a result of the standoff, residents of nearby homes had to be evacuated. Morris did not make the police respond to his threats or determine how many police responded. But the police actions were a direct response to his threats, and Morris continued the standoff after it was readily apparent that many officers had responded. The increased risk presented by the standoff situation was a direct result of Morris's threats.

Morris also argues that the length of the standoff was not a basis for departure because there was no evidence that the standoff was longer than normal. And even if the standoff was unusually long, he argues, that fact does not necessarily mean that his offense was more serious than the typical standoff because the tactical commander of the CIRT set the pace of the standoff. We disagree.

In *State v. Schenk,* 427 N.W.2d 12, 15 (Minn.App.1988), this court affirmed an upward durational departure on a sentence for receiving and concealing stolen property. One factor the trial court cited as a basis for the departure was that the appellant's conduct occurred over an extended period of time. This court expressly recognized that factor as a basis for its conclusion that the durational departure was justified. *Id.* at 14–15. Thus, the fact that an offense continued for a longer period of time than a typical offense has been recognized as a permissible basis for a sentencing departure.

Here, the issue before the trial court was not whether the facts of this case were significantly more serious than a typical standoff. The issue was whether the facts were significantly more serious than a typical case of terroristic threats. The facts in a typical terroristic threats case do not include either a standoff with dozens of police officers that lasts through much of a day or an evacuation of several residences. And we see no basis to conclude that the standoff lasted as long as it did because of decisions made by the commander of the CIRT. The standoff continued because Morris refused to surrender and continued threatening the police. There would not have been a standoff if Morris had not begun threatening police when they arrived.

The last argument that Morris makes is that even if an upward durational departure was warranted, a statutory-maximum sentence was not justified. Morris contends that his conduct does not even come close to the conduct of the defendant in *State v. Murphy,* 545 N.W.2d 909 (Minn. 1996), in which the supreme court affirmed a greater-than-double departure for multiple terroristic threats convictions.

In *Murphy,* the supreme court succinctly described the defendant's conduct as follows:

Murphy's conduct was directed against those persons who have taken action adverse to him in criminal cases in which he was the defendant. Those subject to Murphy's conduct include judges, prosecutors, witnesses, co-defendants, police, state and federal probation employees, and halfway house employees. The nature of Murphy's conduct extends from the heinous to the puerile, including placing dead animals and animal parts–birds, cats, rabbits, deer, and squirrels–at his victims' houses; planting fake bombs; dumping oil and blood on houses; spraypainting epithets and obscenities such as "slut whore," "slut bitch," and "fag, queer, homo," as well as messages such as "I'll come back," "I be back," and "I will be back," on houses and garages; puncturing over 150 tires, breaking car windows, "keying" or scratching cars and damaging car interiors; cutting telephone wires; throwing rocks, bricks, concrete chunks, beer and pop cans and other objects through windows; egging houses and garages; placing broken beer bottles in front of a garage; and calling in fictitious pizza orders and placing fictitious want ads. The conduct alleged in the complaint took place in Ramsey and Dakota Counties and was often committed by stealth under the cover of darkness.

*Id.* at 912.

We agree with Morris that Murphy's conduct was more egregious than his in some respects. As the supreme court specifically noted, Murphy's conduct occurred over a ten-year period, was committed by guile and concealment in the night, was an invasion of the victims' zones of privacy, and evinced the likelihood of repetitive behavior. *Id.* at 917. These egregious factors were not present in Morris's conduct. But *Murphy* does not purport to establish a minimum standard for imposing a sentence that is a greater-than-double depar-

ture. The fact that Murphy's conduct was more serious than Morris's conduct does not mean that the trial court abused its discretion by imposing the statutory-maximum sentence.

Furthermore, Morris's conduct was more serious than Murphy's in at least one significant way. Murphy's threats terrorized his victims and caused them great inconvenience. But with the exception of throwing objects through windows, Murphy did not create an immediate risk of physical injury to his victims. In contrast, Morris's threats caused a standoff situation that was fraught with the risk of serious physical injury to police officers and residents of the surrounding neighborhood.

In making his threats, Morris went well beyond a risk of causing terror and public inconvenience. Morris created a situation that posed a threat of serious physical injury, and by continuing his threats, he sustained this situation until police ultimately had to subdue him due to a reasonable concern for public safety.

## DECISION

Because Morris's threats caused a standoff situation that involved dozens of police officers, lasted for several hours, forced the evacuation of residences in the surrounding neighborhood, and created an immediate risk of physical harm to police officers and residents of the surrounding neighborhood, the trial court did not clearly abuse its discretion by imposing a 60–month, statutory-maximum sentence.

**Affirmed.**