*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0580**

State of Minnesota,
Respondent,

vs.

Marcus Samuel Smith,
Appellant.

**Filed May 13, 2024
Affirmed
Ross, Judge**

Hennepin County District Court
File No. 27-CR-21-23775

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Britta K. Nicholson, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Julie Loftus Nelson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Larkin, Presiding Judge; Ross, Judge; and Bjorkman, Judge.

**NONPRECEDENTIAL OPINION**

**ROSS**, Judge

Marcus Smith had been sending hostile messages to his former girlfriend before he broke through her chain-locked apartment door late one night carrying gasoline-soaked rags, fireworks, and a lighter. Smith now appeals from his consequent charge and

conviction of two counts of threats of violence and one count of stalking, arguing that the evidence was insufficient for the jury to find him guilty of threatening violence, that the prosecutors engaged in misconduct, and that he received ineffective assistance of counsel. We hold that the alleged prosecutorial misconduct did not affect Smith's substantial rights and that he received competent trial representation. We also conclude that sufficient evidence supports the guilty verdict. We therefore affirm.

**FACTS**

The state charged appellant Marcus Smith with one count of first-degree attempted arson, one count of stalking, and two counts of threats of violence. The jury heard testimony describing the following events.

Smith began a romantic relationship in February 2020 with a woman we will call Harper in the interests of her privacy, and the couple eventually moved into a St. Louis Park apartment. About six months after they began sharing the apartment, Smith moved to Michigan to attend graduate school. Harper remained in the apartment. Their relationship deteriorated after Smith's relocation. They each began dating other people, and Smith began posting disparaging remarks on social-media platforms about Harper and her family.

Smith returned to Minnesota in December 2021 during his winter break from school. He went to Harper's apartment wearing a face mask on December 21, removed the screen from her bedroom window, and tried to climb inside. But he left after he realized Harper was in the apartment, and he drove away in his Dodge Charger. Smith posted a video on Instagram, stating, "I did rob the bitch. . . . I did it with this face mask on, and I did it in

front of the police." Smith returned to Harper's apartment the next day with police to reclaim items he had left before moving to Michigan.

Smith continued to attack Harper online, including Instagram "trolling" her new boyfriend and posting Harper's address. On Christmas evening, Harper agreed to speak with Smith in person to resolve their issues, intending to stop Smith's social-media attacks. Harper met Smith in the alley behind her apartment building while Smith remained in his car. Smith asked to go upstairs to Harper's apartment but, stating that her boyfriend was home, Harper declined Smith's request. As she reentered her apartment building, an object hit the back window of Smith's car and shattered it. Then "a group of people . . . came out of the dark" followed by "a whole bunch of hollering and yelling." Smith accelerated rapidly and drove to the St. Louis Park police station. Someone contacted police to report a dark sedan "hot rodding" around the neighborhood.

Smith soon returned to Harper's apartment, apparently believing that the attack on him in his car had been an ambush that she had orchestrated. He threw a rock through her bathroom window, striking Harper's boyfriend's leg. He also threw eggs at the window. Harper summoned the police, who photographed the damage and helped Harper barricade the window using a bookcase.

Smith returned to the apartment several hours later, at about 4:50 a.m. Harper and her boyfriend awoke to the sound of the barricade crashing down and noises coming from the locked bedroom window. Harper dialed 9-1-1 and whispered to the operator, "There's a burning sensation coming on the outside of my door . . . We have to get out . . . My apartment's on fire right now." She told the operator that she smelled smoke. Smith

3

meanwhile attempted to enter the locked apartment. He unlocked the deadbolt using a key he had retained when he moved out, but a chain lock also secured the door. Smith burst through the chain lock, and Harper saw him in the apartment doorway momentarily before Smith ran away. After Smith fled, Harper's boyfriend stepped out of the unit and saw a "decent-sized" puddle of gasoline soaking into the carpet just outside the apartment. He announced, "This idiot poured gasoline. This mother f---[er] was really [trying to] burn us." Officers discovered that the bathroom window screen had been removed.

Officers and a police dog chased Smith. The dog found him hiding in a bush, and police arrested him. They found keys (including one to Harper's apartment), matchbooks, and a lighter on Smith. Officers also found small and large fireworks in the bush. One officer noticed that Smith smelled "pretty heavily of an accelerant." An officer retraced Smith's steps back to the apartment. Along the way he found more of the small fireworks. He also found blue, gasoline-soaked rags.

Officers smelled gasoline in the apartment building immediately outside Harper's unit, and a detection device confirmed the presence of gasoline in the air. They also found more fireworks and a lighter in front of Harper's apartment door. Behind the apartment building, they discovered two more blue, gasoline-soaked rags and fireworks. Officers located Smith's Dodge Charger approximately a half mile away from Harper's apartment. The car contained a nearly full gasoline can, firewood, blue rags, and more fireworks.

After the jury began deliberating, jurors asked to rewatch a police interview of Harper and her boyfriend. They watched the video replay from a prosecutor's laptop projected onto a courtroom screen. As they watched, a co-prosecutor's instant message

4

appeared on the screen because she had failed to disable message notifications. The message read, "They're writing down that [Smith] was in there." Smith's counsel made a record of the incident, acknowledging that he "d[id]n't think [it] was intentional" and that he believed the message display had been "inadvertent."

The jury acquitted Smith of attempted first-degree arson but found him guilty of stalking and both counts of threats of violence. The district court stayed imposition of the sentence, placed Smith on probation for three years, and ordered him to serve 180 days in jail. Smith appeals.

## DECISION

Smith raises three challenges on appeal. He argues first that the state presented insufficient evidence to support his convictions for threats of violence and stalking. He argues second that he is entitled to a new trial because the state engaged in prosecutorial misconduct. And he argues third that his trial counsel was ineffective. None of his challenges lead us to reverse.

## I

Smith unconvincingly argues that the evidence is insufficient to support his convictions for stalking and making threats of violence to Harper and her boyfriend. We address claims of insufficient evidence by viewing the evidence in the light most favorable to the verdict and determining whether the evidence would allow the jury to reach the result that it did. *State v. Olhausen*, 681 N.W.2d 21, 25–26 (Minn. 2004). But when the state relies on circumstantial evidence to prove an element of an offense, we apply a heightened, two-step review to that element. *See State v. Al-Naseer*, 788 N.W.2d 469, 473–74 (Minn.

5

2010). Under that heightened standard, we first identify the circumstances proved, assuming that the jury resolved any factual disputes in a manner consistent with the jury's verdict. *Loving v. State*, 891 N.W.2d 638, 643 (Minn. 2017). We then independently determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis excluding guilt. *State v. Andersen*, 784 N.W.2d 320, 329 (Minn. 2010). Smith's insufficient-evidence challenge fails under this framework.

The state had to prove the elements of threats of violence beyond a reasonable doubt along with the elements of stalking. A person is guilty of making threats of violence if he "threatens, directly or indirectly, to commit any crime of violence with purpose to terrorize another . . . or in a reckless disregard of the risk of causing such terror." Minn. Stat. § 609.713, subd. 1 (2020). And he is relatedly guilty of stalking if he engaged in "two or more acts within a five-year period that violate or attempt to violate the provisions of any of" 17 criminal statutes, including threats of violence. Minn. Stat. § 609.749, subd. 5(a), (b)(3) (2020). Smith argues solely that, because Harper and her boyfriend discovered the threat of arson only after he left the area, he did not make a threat of violence. The argument fails based on the circumstances proved at trial.

The state proved the following circumstances relevant to our analysis. Smith went to Harper's apartment in the early morning of December 26. He returned later and threw a rock through her bathroom window. Harper and police barricaded the broken window. Smith returned two hours later with gasoline-soaked rags, fireworks, and lighters. Someone knocked over the barricade. Harper smelled smoke. Smith broke in through the apartment door. Smith ran away. Someone had just doused the apartment hallway with gasoline

6

immediately outside Harper's unit. Smith hid from police. Police found Smith, smelling like gasoline. Police found matching fireworks near Smith, along the path Smith used while fleeing on foot, in Smith's car, and in the area just outside Harper's apartment unit.

Our first question is whether these circumstances in their totality reasonably imply that Smith's actions directly or indirectly communicated his intent to threaten to injure Harper and her boyfriend by arson. The answer, obviously, is yes. Smith does not dispute that the circumstances support the inference that the threat was eventually communicated, but instead argues that because Harper and her boyfriend discovered the gasoline, fireworks, and lighter only after he fled the scene, he did not communicate the threat of arson. His argument overlooks the fact that the statute is designed to deter and punish both "the future act threatened, as well as the underlying act constituting the threat." *State v. Murphy*, 545 N.W.2d 909, 916 (Minn. 1996). That Smith left the scene and could not therefore imminently carry out the threat at the time it was discovered does not erase the fact that he threatened a future act of violence. The supreme court has upheld convictions based on threats of violence communicated after the perpetrator left the scene. *See, e.g., id.* at 915–16 (affirming a threats-of-violence conviction after the appellant left dead animal parts and fake bombs at multiple victims' residences); *State v. Schweppe*, 237 N.W.2d 609, 614 (Minn. 1975) (upholding the appellant's conviction where he communicated a threat to kill the victim to the victim's friends, and the friends relayed the threat to the victim the following day). The circumstances proved support the reasonable inference that Smith's actions communicated his intent to injure Harper and her boyfriend by arson.

Our second question is whether the proved circumstances could lead to a reasonable inference that Smith communicated an innocent message. Obviously, no. We can think of no implied innocent message, and, more important, Smith does not suggest that one exists. We hold that the state presented sufficient evidence to convict him of both counts of threats of violence. And because those convictions supported his conviction for stalking, we affirm that conviction too.

## II

Smith alleges numerous instances of prosecutorial misconduct, but only one allegation is comprehensible and finds support in the record. He contends that the prosecutor's accidental displaying of the instant message as the jury rewatched a video exhibit warrants a new trial. Because Smith failed to object in district court, we review his prosecutorial-misconduct challenge only under the modified plain-error test. *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006). Under that test, we consider reversing if we determine that an error occurred, that the error was plain, and that the error affected Smith's substantial rights. *Id.* If Smith satisfies his burden of establishing that a plain error occurred, the burden shifts to the state to show that the error did not affect Smith's substantial rights. *Id.* We need not determine whether the state's "inadvertent" message display constitutes a plain error because, for the following reasons, we hold the state has met its burden to show that the incident did not affect Smith's substantial rights.

The alleged misconduct could warrant reversing only if the state failed to show that the error did not affect Smith's substantial rights, meaning "that there is no reasonable likelihood that the absence of the misconduct in question would have had a significant

8

effect on the verdict of the jury." *Id.* (quotation omitted). We reject Smith's contention that the inadvertent message stating, "They're writing down that [Smith] was in there," deliberately suggests his guilt. The only reasonable interpretation to us is that the message referred to what the jurors were doing as they viewed the video. The stated idea "that Smith was in there" is a matter of no real dispute at trial. Someone was "in there" forcing entry into Harper's apartment, and Smith was the only person she saw in her doorway, the only person police chased from the apartment, the only person police found hiding in the bushes smelling like gasoline, and the only person in whose car police found physical evidence matching virtually all the evidence discovered at the scene. We may consider the strength of the state's case against the defendant when determining prejudice, *see State v. Johnson*, 915 N.W.2d 740, 747 (Minn. 2018), and the evidence here pointed overwhelmingly to Smith's guilt.

### III

Smith contends finally that his trial counsel was ineffective because his attorney failed to introduce evidence Smith believed important and because his attorney did not cross-examine the state's witnesses using the questions Smith wanted. The United States and Minnesota Constitutions both provide criminal defendants a right to the effective assistance of counsel. U.S. Const. amend. VI; Minn. Const. art. I, § 6. To obtain relief on his ineffective-assistance claim, Smith must show that his trial counsel's performance fell below an objective standard of reasonableness and that, in the absence of his counsel's unreasonable performance, the result of his trial would have been different. *State v. Jones*, 977 N.W.2d 177, 193 (Minn. 2022) (citing *Strickland v. Washington*, 466 U.S. 668, 687–

9

88 (1984)) (quotation omitted). Smith fails to establish that his trial counsel's performance fell below an objective standard of reasonableness. Each of Smith's alleged instances of ineffective representation would require us to assess the tactical decisions of his trial counsel, which we will not do. *State v. Doppler*, 590 N.W.2d 627, 633 (Minn. 1999). The record establishes that Smith's trial attorney thoroughly cross-examined most of the state's witnesses and provided an alternative theory of the case to the jury. That the strategy was ineffective in this case likely results from the mountain of incriminating evidence facing Smith. Because Smith has not shown that he received inadequate trial representation, his ineffective-assistance claim fails.

**Affirmed.**