STATE of Minnesota, Respondent,

v.

Richard Parnell RUCKER, Appellant.

No. A07–0773.

Court of Appeals of Minnesota.

July 15, 2008.

Lori Swanson, Attorney General, St. Paul, MN; and Doug Johnson, Washington County Attorney, Michael Hutchinson, Assistant County Attorney, Stillwater, MN, for Respondent.

Lawrence Hammerling, Chief Appellate Public Defender, Jessica Godes, Assistant Public Defender, St. Paul, MN, for Appellant.

Considered and decided by SHUMAKER, Presiding Judge; SCHELLHAS, Judge; and MUEHLBERG, Judge.*

## OPINION

SCHELLHAS, Judge.

Appellant Richard Parnell Rucker challenges his convictions of two counts of first-degree criminal sexual conduct and two counts of second-degree criminal sexual conduct arising out of his relationships with two minor females. On appeal, appellant argues that: (1) he was not in a position of authority over the girls; (2) the jury was not adequately instructed as to the meaning of the applicable venue statute; (3) the district court erred in not instructing the jury to unanimously determine which specific acts appellant committed; (4) *Spreigl* evidence was improperly admitted; and (5) the prosecutor's misconduct during closing arguments warrants a new trial. We hold that: (1) appellant was in a position of authority over the girls; (2) the venue statute allowed the prosecution of appellant in the county where his victims resided either at the time he abused them or at the time they reported the abuse; (3) the charged offenses stemmed from two courses of conduct and did not require jury unanimity on the specific acts; (4) *Spreigl* evidence was relevant and not unfairly prejudicial to appellant and, therefore, admissible; and (5) any prosecutorial misconduct failed to meet the threshold of reversible error, and, therefore, we affirm.

## FACTS

In April 2003, appellant was hired as a co-facilitator of Project Alliance (PA), an after-school program designed to help junior-high-school students who needed aca-

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

demic help in the South Washington County School District. N.L., a student at Lake Junior High School, was referred to PA by her school's guidance counselor. A.K., a student at Cottage Grove Junior High School, was referred to PA by her principal. During the 2003–2004 school year, both N.L. and A.K. had contact with appellant through their participation in PA. Appellant and his co-facilitator provided their phone numbers and e-mail addresses to the PA students. Both N.L. and A.K. began communicating with appellant outside of PA classroom hours. During their participation in PA, both N.L. and A.K. were experiencing family trauma: N.L.'s father was diagnosed with cancer, and A.K.'s parents were about to divorce. N.L. expressed suicidal thoughts in a letter and when appellant saw the letter during a PA session, he spoke with N.L. in a hallway, telling her that he had "lost angels in his life" and encouraged N.L. to contact him outside of PA hours.

At trial, N.L. described several incidents of sexual contact she had with appellant. N.L. testified that during her ninth-grade school year, appellant took her to a movie theater, where he rubbed his hands over her pants on her vagina. N.L. also testified about one other incident at a movie theater when appellant digitally penetrated N.L.'s vagina. N.L. also testified that during her ninth-grade school year, while at his apartment in Hennepin County, appellant put his penis inside her vagina. N.L. further testified that on Valentine's Day of 2004 or 2005, while at his apartment, appellant placed his tongue on her vagina and that from the fall of 2003 to the fall of 2005, she went to appellant's apartment "probably around 40" times and engaged in vaginal or oral intercourse "just about every time." N.L. testified as to these and other specific acts of sexual penetration and an estimated 40 additional acts of penetration occurring on 40 additional dates. Appellant testified that he

had taken N.L. shopping and had purchased clothes for her.

A.K. described similar incidents at trial. A.K. testified that appellant told her he would take her out to celebrate her 14th birthday if she worked hard to improve her grades. With the permission of A.K.'s parents, appellant took A.K. to a movie theater and a restaurant; appellant testified that he could not remember where the theater and restaurant were located. A.K. testified that on this occasion, appellant digitally penetrated her vagina twice. A.K. also testified that on Valentine's Day, 2004, while at appellant's apartment, appellant penetrated A.K.'s vagina with his finger and his tongue and then rubbed his penis on top of, but not inside, her vagina. A.K. testified that on "maybe three or four" occasions, appellant digitally penetrated her vagina while parked in his car on her block before dropping her off after PA, and that between Valentine's Day 2004 and February 2005, appellant would "do stuff sexually" with A.K. at his apartment in Minneapolis, including digital penetration of her vagina. A.K.'s testimony recounted between seven and eight specific acts of sexual penetration on five or six different dates, and estimated that several additional acts of penetration occurred. A.K. also testified that, in addition to taking her to a movie, appellant gave her a pair of diamond earrings that he told her cost $200. A.K.'s sexual relationship with appellant ended after A.K. moved from her home in Washington County to Dakota County.

Coincidentally, N.L. and A.K. had known of each other in elementary school and became reacquainted after meeting at a PA function in August 2005. They communicated afterward and discovered that both had relationships with appellant outside of PA. After months of communicating with N.L., when A.K. had moved from

Washington County to Dakota County, A.K. told her father about her sexual contact with appellant. A.K.'s father told her to notify the police, who in the course of investigating A.K.'s allegations, contacted N.L., who still resided in Washington County and continued to reside there at the time of appellant's trial.

Appellant was tried in Washington County on two counts of first-degree criminal sexual conduct and two counts of second-degree criminal sexual conduct. The issue of venue was a point of contention between the prosecution and appellant. The prosecution and defense disagreed on the meaning of "where the child is found" as used in Minn.Stat. § 627.15 (2002), which allows a criminal action for alleged child abuse to be prosecuted either in the county where the alleged abuse occurred or the county "where the child is found." The defense wanted the statutory language to be submitted to the jury without interpretation. The defense also wanted to present an argument to the jury as to when a child has to be found in a county to allow prosecution in that county, which was relevant because A.K. moved out of Washington County before the abuse was reported. The district court ruled in favor of the defense and instructed the jury that a child may be "found" and abuse may be prosecuted "in the county where the alleged abuse occurred" or the county where the child resides. In closing, the prosecutor argued that the element of venue was satisfied because one act of penetration occurred at a theater in Washington County and because A.K. lived in Washington County during the time that appellant abused her. The defense argued that since A.K. did not reside in Washington County when she reported the abuse, he could not be prosecuted in Washington County for sexually abusing A.K. in Hennepin County.

The prosecution sought to introduce *Spreigl* evidence regarding a 1993 incident between appellant and a 15–year–old girl, S.M., for which appellant was convicted of gross-misdemeanor fifth-degree criminal sexual conduct. Appellant met S.M., who was a runaway, when he was a bass-guitar player for a choir in which S.M. sang. Appellant and S.M. had sexual intercourse in appellant's Minneapolis apartment, the same apartment to which appellant took N.L. and A.K. As a result of his sexual contact with S.M., appellant was convicted in 1994, but his conviction was later expunged from his record. The district court found that because that incident and the charged offenses involved sexual conduct at appellant's apartment with minor girls who were considerably younger than appellant, the evidence was admissible to show a "common scheme and plan." The prosecution and the defense eventually stipulated that in lieu of S.M.'s live testimony, the jury would receive copies of documents related to the 1993 incident and would be told that the resulting conviction was expunged from his record. The district court instructed the jury that the evidence was only to be used to determine if appellant committed the charged offenses, and not to judge the defendant's character.

Appellant consistently testified at his trial that he had no sexual contact with N.L. or A.K. At the conclusion of the trial, the prosecution began its closing argument by describing a hypothetical personal advertisement for appellant:

> If the defendant Rucker placed a classified ad in a newspaper it would read as follows: Adult male working for out-of-the-box homework club program seeks females ages thirteen to fifteen for sexual gratification. Problems at home and thoughts about committing suicide a plus. Must be able to work weekends and week days. Excellent fringe bene-

fits including movies, dinner, jewelry, and clothing.

The prosecutor also suggested the motives behind some of appellant's statements. For example, the prosecutor said, in reference to an e-mail message admitted as evidence:

> Look at the exhibit and see what his response was. "Not on the computer." I'm not going to tell you on the computer how I feel. This might become adverse to me later on if I do it on the computer as a paper trail. Somebody seeing that might think that what you're saying is true and I don't want to be locked into that.

At the end of his argument, the prosecutor stated, "[t]his is a search for the truth. A search for the truth is what we do in criminal court. And that's what those two girls testified to." The defense argued in closing that the police "rushed to judgment" in not verifying the victims' statements. In rebuttal, the prosecution stated, "[t]hey suggest that the police engaged in a rush to judgment. Boy, that term's never been used in a courtroom before."

The jury convicted appellant on all four charges, and this appeal followed.

## ISSUES

I. Was appellant in a position of authority over his victims when he abused them?

II. For purposes of the venue statute, can a child be "found" in a county if he or she resided there at the time the abuse occurred?

III. Did the district court err in not instructing the jury to unanimously agree on the acts of which it was convicting the defendant?

IV. Was *Spreigl* evidence from a 1993 incident erroneously admitted?

V. Did the prosecutor commit misconduct sufficient to warrant a new trial?

## ANALYSIS

### I. Position of Authority

■■■ To convict appellant of first-degree criminal sexual conduct,[1] the state had to prove that he was in a position of authority over the victims at the time of the acts. Construction of a criminal statute is a question of law subject to de novo review. *State v. Murphy*, 545 N.W.2d 909, 914 (Minn.1996). A statute is to be construed according to its plain language. Minn.Stat. § 645.16 (2002). If the language of a statute is ambiguous, the intent of the legislature controls. *Id.* "A rule of strict construction applies to penal statutes," so as to "guard against the creation of criminal offenses outside the contemplation of the legislature, under the guise of judicial construction." *State v. Colvin*, 645 N.W.2d 449, 452 (Minn.2002) (quotation omitted). "[A]ll reasonable doubt concerning legislative intent should be resolved in favor of the defendant." *Id.*

Minnesota Statutes, section 609.341, subdivision 10 (2002), provides that a person in a " 'position of authority' includes but is not limited to": (1) "any person who is a parent or acting in the place of a parent and charged with any of a parent's rights, duties or responsibilities to a child"; and (2) "a person who is charged with any duty or responsibility for the health, welfare, or supervision of a child, either independently or through another, no matter how brief, at the time of the act." Appellant argues that as a matter of law, he was

---

1. First-degree criminal sexual conduct includes sexual penetration with a complainant who is at least 13 years of age but less than 16 years of age and the actor is more than 48 months older than the complainant and in a position of authority over the complainant. Minn.Stat. § 609.342, subd. 1(b) (2002).

not in a position of authority over either victim at the time of the abuse. Appellant asserts that the first example in section 609.341 does not apply here because he was not acting in the place of a parent. Appellant asserts that the second example does not apply because he was not accused of abusing the victims during PA hours, which appellant argues are the only times he could have been in a position of authority over them. But the circumstances in which a person is in a position of authority are not limited to the examples of "position of authority" described in section 609.341, subdivision 10. *Id.* This court has held that "position of authority" is "broadly defined" under this statute, *State v. Willette,* 421 N.W.2d 342, 345 (Minn.App.1988), *review denied* (Minn. May 16, 1988), and that the statutory definition "does not contain an exclusive list of persons in a position of authority," *State v. Larson,* 520 N.W.2d 456, 461 (Minn.App.1994), *review denied* (Minn. Oct. 14, 1994).

Here, appellant supervised both N.L. and A.K. while they participated in PA. Through PA, appellant exchanged personal contact information with the victims, encouraging his victims to use the information to maintain their relationships with appellant outside of PA hours. On at least one occasion, appellant pulled N.L. aside during PA hours and encouraged her to contact him personally. On at least one other occasion, appellant took A.K. away from her home with her parents' permission outside of PA hours as a reward for her success in the PA program. Several of the incidents of abuse involving A.K. occurred when appellant was dropping her off at home outside PA hours. Given the broad reading of the statutory definition of "position of authority," these facts support a determination that appellant was in a position of authority over both N.L. and A.K. Therefore, we conclude that appellant was in a position of authority over the course of his sexual abuse of A.K. and N.L.

## II. Venue

 Appellant argues that the district court erred by not properly instructing the jury as to the element of venue. A district court has "considerable latitude in selecting the language of jury instructions." *State v. Baird,* 654 N.W.2d 105, 113 (Minn. 2002). Jury instructions must define the elements of the crime charged and "it is desirable for the court to explain the elements of the offense rather than simply to read statutes." *State v. Kuhnau,* 622 N.W.2d 552, 556 (Minn.2001). If the jury instructions correctly state the law in language that can be understood by the jury, there is no reversible error. *State v. Peou,* 579 N.W.2d 471, 475 (Minn.1998).

Generally, in a criminal trial, the accused has the right to be tried "by an impartial jury of the county or district wherein the crime shall have been committed." Minn. Const. art. I, § 6. But a criminal action arising out of an incident of alleged child abuse may be prosecuted either in the county where the alleged abuse occurred or the county where the child is *found.* Minn.Stat. § 627.15 (2002) (emphasis added). In *Larson,* this court held that the legislature intended that a child could be "found" in his or her county of residence. 520 N.W.2d at 460. The district court relied on *Larson* when it instructed the jury that as to each charge of criminal sexual conduct, appellant may be prosecuted "in the county where the child resides." In this case, A.K. moved from Washington County to Dakota County before she reported abuse that occurred when she lived in Washington County. Thus, appellant argues that the district court should have instructed the jury as to *when* it was necessary for A.K. to have resided in Washington County in order to be "found" there. Instead, the district court permitted the prosecution to argue in closing that "where the child resides"

could mean where the child resided when the abuse occurred and permitted appellant to argue that "where the child resides" could only mean where the child resided when the abuse was reported.

The phrase "where the child resides" is vague with respect to time, and no published authority defines when a child must reside in a county in order for abuse of the child to be prosecuted in the county. But as this court noted in *Larson, id.*, the supreme court's holding in *State v. Krejci,* 458 N.W.2d 407, 411 (Minn.1990), implies that the venue statute is to be interpreted liberally. In *Krejci,* the child-victim was physically assaulted in Renville County, and the abuse was discovered in Hennepin County. 458 N.W.2d at 408–09. The supreme court held that because authorities discovered the abuse in Hennepin County, the child was "found" there even though the abuse itself occurred in a different county. *Id.* at 412. Additionally, the supreme court described many of the situations specific to child-abuse cases that necessitate a liberal construction of the venue statute. *Id.* at 411. For example, incidents of child abuse may not be immediately or accurately reported; the child may not be aware of where the abuse occurred; or the child may be moved to another county against his or her will. *Id.* The *Krejci* court noted that the legislature enacted section 627.15, in part, because the "hidden nature of child abuse" gives rise to difficulty in establishing venue. *Id.*

In *Larson,* where the child-victim who resided in Goodhue County was sexually abused in Renville County and Goodhue County, this court relied on the reasoning in *Krejci.* 520 N.W.2d at 459. In response to the defendant's argument that the child could not be "found" in her county of residence, we held that "[t]he plain language of section 627.15 does not support such a limited interpretation." *Id.* at 460.

We further held that a child could be "found" in her county of residence because "[t]he statute contains no terms limiting how or where a child may be 'found,' " and the legislature intended that a child could be "found" in her county of residence. *Id.* (citing *Hearing on S.F. No. 1291 Before the Senate Judiciary Committee, Criminal Law Division* (Apr. 19, 1977)).

■ Because in *Larson,* we did not establish the point in time at which a child must reside in a county in order to be "found" there, confusion exists about the proper application of the venue statute in this case. The liberal construction of the venue statute, advocated by the *Krejci* and *Larson* courts, does not support a narrow interpretation that a child can be "found" only in the county in which she resided at the time the abuse was discovered and not in the county in which she resided at the time the abuse occurred. Such a narrow interpretation of the venue statute would fail to address the particular difficulty in establishing venue in child-abuse cases as described in *Krejci.* Therefore, we hold that for the purpose of establishing venue in the limited area of child-abuse, a child can be "found" in the county where the child resided either when the abuse occurred or when the abuse was discovered. In this case, the jury was properly instructed as to the element of venue.

## III. Jury Unanimity

■ "A unanimous verdict shall be required in all cases." Minn. R.Crim. P. 26.01, subd. 1(5). But a jury need not agree unanimously with respect to the alternative means or ways in which a crime can be committed. *State v. Begbie,* 415 N.W.2d 103, 106 (Minn.App.1987), *review denied* (Minn. Jan. 20, 1988). Generally, specific dates need not be proved in cases charging criminal sexual conduct over an extended period of time. *See State v.*

*Becker,* 351 N.W.2d 923, 927 (Minn.1984) (holding that a defendant can be convicted of sexual abuse if the prosecution proves abuse occurred within a reasonable period of time; specific dates of abuse need not be proven); *State v. Poole,* 489 N.W.2d 537, 543 (Minn.App.1992) (providing "specific dates need not be charged or proven in a sexual abuse case"), *aff'd,* 499 N.W.2d 31 (Minn.1993). But if each act itself constitutes an element of the crime, "the jury must unanimously agree on which acts the defendant committed." *State v. Stempf,* 627 N.W.2d 352, 355 (Minn.App.2001).

■ Relying on *Stempf,* appellant argues that the jury should have been instructed to reach a unanimous verdict as to which specific acts appellant committed. In *Stempf,* the defendant was charged with a single count of methamphetamine possession. *Id.* at 354. The state introduced evidence at trial that the defendant possessed methamphetamine on two separate occasions and told the jury in closing arguments that it could convict the defendant even if it could not agree on which occasion the defendant possessed methamphetamine. *Id.* The defendant had separate defenses for each of the occasions on which he was accused of possessing methamphetamine. *Id.* On appeal, this court reversed Stempf's conviction, stating that "[b]ecause the state did not elect which act of possession it was relying on for conviction" the district court's refusal to give a specific unanimity instruction violated the defendant's right to a unanimous verdict. *Id.* at 358. But in *Stempf,* although only one offense was charged, the defendant's conduct occurred in two different, known locations. *Id.* at 354. In this case, appellant was convicted of one count of first-degree criminal sexual conduct and one count of second-degree criminal sexual conduct as to each victim whom he was alleged to have abused over a two-year period, and the jury was instructed only to find whether the acts occurred between August 2003

and August 2005. Unlike *Stempf,* the prosecution here did not emphasize certain incidents, distinguish as to the proof of some incidents compared to others, or encourage the jury to find certain incidents were more likely to have occurred than other incidents, and appellant did not present separate defenses for each incident of alleged sexual abuse; rather, he simply maintained throughout his trial that he never had sexual contact with either child-victim. The victims referred to a few specific dates in their testimony on which incidents of abuse occurred, but with respect to their testimony and the state's case as a whole, these recollections served as examples of appellant's conduct and not distinct allegations of sexual abuse. Based on the particular facts of this case, we conclude that the district court did not err in not instructing the jury that it must unanimously agree on which specific incidents formed the basis of appellant's convictions.

Appellant attempts to make a separate argument that the jury verdict was unfair because it provides him no way of knowing the alleged act or acts on which he was convicted. He argues that because there was insufficient evidence of some of the alleged acts, his convictions must be reversed. Appellant cites no caselaw supporting his argument and none appears to exist. On the contrary, in *State v. Shamp,* the supreme court considered this court's ruling that "it cannot be said with certainty that the jury did not base its finding of guilt partially" on incidents outside the limitations period. 427 N.W.2d 228, 230–31 (Minn.1988) (quotation omitted). The supreme court reversed this court's ruling, determining that there was "no reasonable likelihood that the jury somehow discredited the victim's testimony relating to abuse" before the limitations period, yet credited the victim's testimony relating to abuse after it. *Id.* at 231. Moreover, a

holding that appellant is entitled to know the specifically alleged acts of which he was convicted would run counter to the holding in *Becker*, that specific dates need not be proven for a defendant to be convicted of sexual abuse. We conclude that appellant's argument has no merit.

## IV. *Spreigl* Evidence

▮▮▮▮▮ We review the district court's decision to admit evidence of past crimes for an abuse of discretion. *State v. Gomez*, 721 N.W.2d 871, 877 (Minn.2006). Evidence of past crimes or bad acts, referred to as *Spreigl* evidence, is generally not admissible to show the defendant's character for committing crimes, but can be admitted to show motive, intent, absence of mistake, identity, or common scheme or plan. Minn. R. Evid. 404(b); *State v. Spreigl*, 272 Minn. 488, 493, 139 N.W.2d 167, 170 (1965). *Spreigl* evidence can be admitted only if:

> (1) notice is given that the state intends to use the evidence; (2) the state clearly indicates what the evidence is being offered to prove; (3) the evidence is clear and convincing that the defendant participated in the other offense; (4) the *Spreigl* evidence is relevant and material to the state's case; and (5) the probative value of the *Spreigl* evidence is not outweighed by its potential for unfair prejudice.

*Gomez*, 721 N.W.2d at 877 (quoting *State v. Kennedy*, 585 N.W.2d 385, 389 (Minn. 1998)). "If it is unclear whether *Spreigl* evidence is admissible, the benefit of the doubt should be given to the defendant and the evidence should be excluded." *Id.* "*Spreigl* evidence ... [must be] substantially similar to the charged offense—determined by time, place and modus operandi," but need not be identical to the charged offense. *Kennedy*, 585 N.W.2d at 391. But when *Spreigl* evidence is introduced to show a common plan or scheme, as in this case, it must have a "*marked*

*similarity* in modus operandi to the charged offense." *State v. Clark*, 738 N.W.2d 316, 346 (Minn.2007). Appellant bears the burden of showing the error and any prejudice resulting from it. *Kennedy*, 585 N.W.2d at 389. When a district court errs in admitting *Spreigl* evidence, a reviewing court will not reverse unless there is a reasonable possibility that the evidence significantly affected the verdict. *Clark*, 738 N.W.2d at 347.

Here, the jury was allowed to see limited evidence of appellant's 1994 gross-misdemeanor conviction for fifth-degree criminal sexual conduct that was later expunged. The *Spreigl* incident involved appellant, at age 30, and a 15–year–old girl, whom appellant met through a choir. The prosecution and defense stipulated to the manner of presenting this evidence after the district court determined that the evidence was admissible to show a "common scheme." Appellant now argues that this evidence was admitted erroneously because it was too remote in time, was not "markedly similar" to the charged offense, and was unduly prejudicial to appellant.

▮▮▮▮▮ As to remoteness in time, the supreme court has upheld the admission of *Spreigl* evidence as old as 19 years. *See State v. Wermerskirchen*, 497 N.W.2d 235, 242–43 (Minn.1993) (admitting evidence of several past incidents of abuse against the defendant, the oldest of which occurred 19 years before trial). "The ultimate issue is not the temporal relationship but relevance," which "generally must be determined by the trial court, with review limited to whether the trial court abused its discretion." *Id.* at 242 n. 3. Where, as here, the defendant denies that any sexual contact occurred, and claims fabrication or mistake, the district court may admit *Spreigl* evidence if it "is satisfied that the other crime is sufficiently relevant to the

charged crime." *Id.* Nonetheless, "the more distant the *Spreigl* act is in terms of time, the greater the similarities as to place and modus operandi must be to retain relevance." *State v. Washington,* 693 N.W.2d 195, 202 (Minn.2005).

In this case, the places where the incidents occurred are either geographically close or identical; both the 1993 incident and some of the incidents underlying the charged offenses occurred at appellant's Minneapolis apartment, while the balance of the charged offenses occurred elsewhere in Hennepin and Washington counties. As to similarities in modus operandi, both the *Spreigl* incident and the charged offenses involved appellant's sexual abuse of vulnerable minors of similar ages, whom he met through social organizations, at appellant's apartment. Appellant's position relative to the victims, as a bass player in a church choir in 1993 and as an after-school program worker in the charged offenses, is not a significant difference. Further, while the 1993 incident was a single incident, the record also shows that the victim in that incident was brought to the police a day after the incident occurred. We conclude that the 1993 incident was sufficiently similar to the charged offenses and, thus, relevant.

Appellant cites *State v. Ness,* 707 N.W.2d 676, 688 (Minn.2006), in which *Spreigl* evidence that the defendant had touched the "intimate parts" of a child in the past was held to be irrelevant and, therefore, inadmissible, to support his argument that the *Spreigl* evidence here is irrelevant. But in *Ness,* some of the *Spreigl* evidence was 35 years old and the "[t]he state's case was strong overall and especially so with regard to dispelling any sense that" the victim's testimony was fabricated. *Id.* at 680, 688. In other cases, the admission of *Spreigl* evidence to rebut the defendant's charge that a witness's testimony was fabricated has been af-

firmed. *See Kennedy,* 585 N.W.2d at 391; *Wermerskirchen,* 497 N.W.2d at 242. Here, although the state's case included a number of witnesses and exhibits, there is no indication that the state's case was "especially" strong regarding appellant's primary defense that the victims' testimony was fabricated.

Appellant also cites *Ness* in support of his argument that the *Spreigl* evidence was unfairly prejudicial because the prosecution's case against him was too strong to justify the admission of *Spreigl* evidence and because the *Spreigl* evidence unfairly casts him as a predator of teenage girls. But in *Ness,* the state already had the testimony of a "very credible" eyewitness to establish a "particularly" strong case as to the issue the *Spreigl* evidence was admitted to bolster, i.e., the victim's credibility. 707 N.W.2d at 688. The record here shows no evidence that makes the state's case "particularly" strong as to whether N.L.'s or A.K.'s accounts of sexual abuse were credible, and the fact that N.L. and A.K. knew each other before their experiences with appellant and communicated with one another before reporting the incidents to authorities may have called into question their credibility, weakening the state's case. Although the portrayal of appellant as a predator of teenage girls was likely prejudicial to appellant, our analysis of the admissibility of *Spreigl* evidence focuses on the potential for *unfair* prejudice, "the capacity of the evidence to persuade by illegitimate means." *Gomez,* 721 N.W.2d at 879 (quotation omitted). In this case, there were substantial safeguards against illegitimate persuasion. After initially limiting the prosecution to eliciting only certain facts, the district court accepted the joint stipulation of the prosecution and defense that only the sentencing documents and a copy of the victim's statement from

the 1993 offense would be presented to the jury in lieu of live testimony. The jury was also informed that the conviction was expunged from appellant's record, and it was properly instructed as to the limited purpose for which the *Spreigl* evidence could be used. Based on the careful presentation of the *Spreigl* evidence in this case, we conclude that its potential for unfair prejudice did not outweigh its probative value.

## V. Prosecutorial Misconduct

■■■■ Appellant argues that the prosecutor committed misconduct in characterizing and dramatizing aspects of his actions, by vouching for witness credibility, and by denigrating the defense. Appellant did not object to this conduct at trial. The failure to object implies that the appellant found nothing improper in the closing argument. *State v. Daniels,* 332 N.W.2d 172, 180 (Minn.1983). This court will not review unobjected-to prosecutorial misconduct unless it amounts to error that is (1) plain, i.e., clear or obvious, and (2) affects the defendant's substantial rights. *State v. Ramey,* 721 N.W.2d 294, 302 (Minn. 2006). The burden is on the defendant to prove that error occurred and that the error was plain. *Id.* But once the defendant has satisfied this burden, the burden shifts to the state to show that there is "no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *Id.* (quotations omitted). Examples of such misconduct are inflaming the passions and prejudices of the jury, vouching for the credibility of witnesses, and denigrating the defense. *Id.* at 300.

■■■■ A prosecutor is not required to make a colorless closing argument. *State v. Williams,* 586 N.W.2d 123, 127 (Minn. 1998). Rather, a prosecutor "has the right to present to the jury all legitimate arguments on the evidence, to analyze and explain the evidence, and to present all proper inferences" that the jury may draw from it. *Id.* (quotation omitted). But a "prosecutor must avoid inflaming the jury's passions and prejudices against the defendant." *State v. MacLennan,* 702 N.W.2d 219, 235 (Minn.2005) (quotation omitted). The court looks at the closing argument as a whole when considering claims of prosecutorial misconduct. *State v. Walsh,* 495 N.W.2d 602, 607 (Minn.1993). In cases where credibility is the central issue, as here, special attention should be paid to statements that may prejudice or inflame the jury. *State v. Porter,* 526 N.W.2d 359, 363 (Minn.1995). "Prosecutors in sexual abuse cases must abide by the highest behavior." *State v. Danielson,* 377 N.W.2d 59, 61 (Minn.App.1985) (quotation omitted). Because sexual-abuse cases generally evoke emotional reactions, an attempt by the prosecutor to exacerbate such reactions by making "any emotive appeal" to the jury "is likely to be highly prejudicial." *Id.* (quotation omitted).

■■■■ Appellant argues that the prosecutor's closing remarks, characterizing his conduct in the form of a classified ad, inflamed the passion and prejudice of the jury. Appellant also argues that the prosecutor's closing remarks argued facts not in the evidence. *See State v. Ferguson,* 729 N.W.2d 604, 616 (Minn.App.2007) (holding that it is improper for a prosecutor to mischaracterize evidence or make arguments unsupported by the record), *review denied* (Minn. June 19, 2007). But a prosecutor may make reasonable inferences from the facts. *State v. Gulbrandsen,* 238 Minn. 508, 511, 57 N.W.2d 419, 422 (1953). In closing, in addition to quoting from appellant's e-mail to A.K., the prosecutor described appellant's conversation with N.L.:

The fact of the matter is he took her outside and he said, ["]I've lost angels in

my life.["] That's the first step. [Let's] get going with her the same way I got it going with [A.K.]. You fit the criteria, you're under the age of 16 and you're in my class and you're a girl and you've got problems at home, baby. I can work with that. I can work with somebody [who's] down and out, [who's] thinking about killing herself. Come to me, all you who labor. Come to my apartment.

The prosecution's reference to the "classified ad" was hypothetical and phrased to the jury as such. In the hypothetical ad, the prosecutor referred to facts on the record, including that appellant bought jewelry and clothing for the victims, treated them to movies, treated A.K. to dinner, and that N.L. had suicidal thoughts. The prosecution's use of a hypothetical device based on evidence to express its argument to the jury has been held to be permissible conduct. *See State v. Barnes,* 713 N.W.2d 325, 336 (Minn.2006) (holding that a hypothetical "blow-by-blow" account of an unwitnessed fight in the prosecutor's closing argument, using qualified language and based on evidence, was not prosecutorial misconduct). In the other examples appellant presents, the statements directly attributable to appellant comprise a small part of the prosecutor's account of them, and the prosecutor appears to have been characterizing appellant's motivations in making these statements. Prosecutors are permitted to make reasonable inferences from evidence on the record, to analyze or explain the evidence, and to make legitimate arguments to the jury based on the evidence. *State v. Roman Nose,* 667 N.W.2d 386, 402 (Minn.2003). The prosecutor's use of these dramatic devices was an attempt to make reasonable inferences from the record in a persuasive fashion and, as such, was not misconduct.

■■■■ Appellant also argues that the prosecutor's closing remarks improperly vouched for the credibility of the complain-

ants. "[V]ouching occurs when the government implies a guarantee of a witness's truthfulness, refers to facts outside the record, or expresses a personal opinion as to a witness's credibility." *State v. Patterson,* 577 N.W.2d 494, 497 (Minn.1998) (quotation omitted). It is improper for a prosecutor to "personally [endorse] the credibility of the state's witnesses [or to inject] personal opinion." *State v. Parker,* 353 N.W.2d 122, 128 (Minn.1984). In closing, the prosecutor stated, "[t]his is a search for the truth. A search for the truth is what we do in criminal court. And that's what those two girls testified to." Appellant argues that in making these statements, the prosecutor improperly vouched for N.L.'s and A.K.'s credibility.

■■■■ But prosecutors are not prohibited from arguing that certain witnesses are believable. *See State v. Gail,* 713 N.W.2d 851, 866 (Minn.2006) (concluding that calling a witness "a believable person" and "frank and sincere" was not improper vouching). In *State v. Swanson,* 707 N.W.2d 645, 656 (Minn.2006), the supreme court drew an important distinction between permissibly addressing witness credibility and impermissibly vouching for a witness. In *Swanson,* the supreme court held that the prosecutor was not vouching for witnesses by stating that witnesses were "very believable," but was impermissibly vouching for one witness by saying "[t]he state believes [the witness] is very believable." *Id.* The *Swanson* court held that the prosecution may discuss "factors affecting the credibility of the witnesses," but may not imply that the state endorses a witness's credibility. *Id.; see also State v. Googins,* 255 N.W.2d 805, 806 (Minn. 1977) ("[A prosecutor has] a right to analyze the evidence and vigorously argue that the state's witnesses were worthy of credibility."). In light of *Swanson,* we de-

termine that the prosecutor here was permissibly arguing in favor of the witnesses' credibility.

Moreover, the prosecutor followed these statements by arguing that the jury "can look at [the victims'] frankness and their sincerity from the standpoint of how difficult it was for them to be subjected to direct examination by the State and also [cross-examined] by [appellant's] lawyers." Placed in this context, the prosecutor's statement that N.L. and A.K. testified truthfully was a prelude to reminding the jury of the facts they could consider in evaluating the credibility of the victims' testimony. As such, these statements arguably refer to factors for the jury to consider in assessing credibility, rather than directly vouching for their credibility. *See Googins,* 255 N.W.2d at 806 (stating prosecution has right to vigorously argue state's witnesses are credible). Because these statements were used in the context of reviewing the evidence and urging the jury to find N.L. and A.K. credible, we conclude that they were not improper.

 Finally, appellant argues that the prosecutor's closing remarks improperly denigrated the defense. A prosecutor may argue that a defense has no merit in view of the evidence, but may not denigrate a particular defense in the abstract. *State v. Salitros,* 499 N.W.2d 815, 818 (Minn.1993). Prosecutors act improperly when they "suggest that the arguments of defense counsel are part of some sort of syndrome of standard arguments that one finds defense counsel making in 'cases of this sort.' " *Id.* In this case, the defense's closing argument alluded to several incidents where it suggested that the police did not diligently pursue evidence that would have strengthened the state's case. The prosecutor said in closing that "[the defense suggests] that the police engaged in a rush to judgment. Boy, that term's never been used in a courtroom before."

While denigrating a particular kind of defense in general is impermissible, a prosecutor may attack the defense's arguments on their merits. *State v. Ashby,* 567 N.W.2d 21, 28 (Minn.1997). But here, the prosecutor did not follow this statement by referring to evidence that would rebut the charge that the police "engaged in a rush to judgment," nor did the prosecution address the facts that the defense used in support of this claim in its closing. Because this statement did not address the merits of the defense's argument, we conclude that it impermissibly denigrated the defense and amounts to plain error.

 Where unobjected-to prosecutorial misconduct results in plain error, the state has the burden to prove that there was no reasonable likelihood that the error could have affected the jury's verdict. *Ramey,* 721 N.W.2d at 302. In this case, the statements at issue amounted to two lines in a 29-page closing argument. *See State v. Tate,* 682 N.W.2d 169, 178 (Minn.App.2004) (holding that jury was not unduly influenced by improper statements in prosecution's closing argument amounting to 13 lines of a closing argument transcript that was 25 pages long), *review denied* (Minn. Sept. 29, 2004). In addition, the record includes substantial evidence against appellant, including the testimony of the victims and several pieces of documentary evidence. The strength of the evidence against appellant indicates that these statements in the closing argument did not have a substantial effect on appellant's right to a fair trial. *See Ashby,* 567 N.W.2d at 28 (concluding prosecutorial error was harmless given the strength of evidence against defendant); *Walsh,* 495 N.W.2d at 607 (concluding that, even where closing argument was "in some respects out-of-bounds," it is regarded as harmless error unless the misconduct played a substantial role in jury's decision to convict). We conclude that the state

has satisfied its burden of showing that the prosecutor's denigration of the defense, although it was plain error, did not substantially affect appellant's rights.

## DECISION

Because the record shows that appellant was in a position of authority over his victims; because a child may be "found" under Minn.Stat. § 627.15 where he or she resides, either when the child was abused or when the child reported the abuse; because unanimity of the jury as to specific acts was not required in this case; because *Spreigl* evidence of the 1993 incident was not so remote in time or dissimilar to the charged offenses, nor potentially so unfairly prejudicial, as to be inadmissible; and because the prosecutor's comments were either proper or failed to meet the legal standard for reversible error, we affirm.

**Affirmed.**