# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A16-0040

State of Minnesota,
Respondent,

vs.

Edwin Gochingco Reyes,
Appellant.

**Filed January 9, 2017**
**Affirmed**
**Halbrooks, Judge**

Dakota County District Court
File No. 19HA-CR-13-2657

Lori Swanson, Attorney General, St. Paul, Minnesota; and

James C. Backstrom, Dakota County Attorney, Elizabeth M. Swank, Assistant County Attorney, Hastings, Minnesota (for respondent)

Jeffrey C. Dean, Dean Law Office, Minneapolis, Minnesota (for appellant)

Considered and decided by Halbrooks, Presiding Judge; Rodenberg, Judge; and Kirk, Judge.

## S Y L L A B U S

A stepgrandfather-stepgranddaughter relationship constitutes a "significant relationship" as defined by Minn. Stat. § 609.341, subd. 15 (2010).

## **O P I N I O N**

**HALBROOKS**, Judge

Appellant challenges his second-degree criminal-sexual-conduct convictions, arguing the district court erred when it interpreted the term "significant relationship" in Minn. Stat. § 609.341, subd. 15, to include a stepgrandfather-stepgranddaughter relationship and abused its discretion when it permitted experts to testify generally about sexual abuse of adolescents. Because we hold that the district court correctly found stepgrandfathers to be included in the statutory definition of "significant relationship" and that the district court did not err when it allowed into evidence general expert testimony regarding characteristics of minors who have been sexually abused, we affirm.

### **FACTS**

In February 2007, M.C.'s mother, C.R., married R.R., the son of appellant Edwin Gochingco Reyes. According to M.C., one summer day in 2009, when she was 11 years old, Reyes—M.C.'s stepgrandfather by marriage—told M.C. that she had to kiss him in order to receive a gift. When M.C. attempted to kiss Reyes on the lips, Reyes inserted his tongue into M.C.'s mouth. Reyes told M.C. that she did not have to tell anyone about the kiss; so M.C. did not tell anyone at that time.

That same summer, M.C. stayed at Reyes's house while her mother and stepfather attended a baseball game. M.C., her sister, and Reyes were watching TV while on Reyes's bed. Reyes told M.C. to sit next to him. M.C. complied and eventually fell asleep. She woke up from a nap to find Reyes moving her hand inside his pants, rubbing his penis in a circular motion. M.C. did not know what to do until 20-30 seconds later when she pulled

2

her hand away and said that she had to go to the bathroom. M.C. typed a text message to send to R.R. describing what happened, but erased it before sending it because she was afraid, nervous, and embarrassed, and did not know if R.R. would believe her. Later that day, Reyes and Z.R., Reyes's wife, took M.C. to a mall where Reyes asked M.C. if she was upset about what happened. M.C. did not respond and did not tell anyone about it because she felt weak and embarrassed.

In late summer 2010, M.C. stayed with Reyes for a weekend while her mother and stepfather were out of town. Reyes and M.C. were in the basement alone. Reyes asked M.C. to sit on his lap. When she did, Reyes started touching and grabbing M.C.'s chest over her clothes, and put his hand inside M.C.'s pants but on top of her underwear. This continued for 5-10 seconds. When M.C. left, Reyes again told her she did not have to tell anyone what had happened.

In mid-October 2010, M.C., C.R., and R.R. moved to Nebraska. While working on a school health lesson with M.C. about sexual touching, C.R. asked her if anyone had ever touched her inappropriately. In response, M.C. told C.R. about the incidents with Reyes. C.R. and R.R. decided to set up therapy for M.C. and themselves. As time went on, M.C. disclosed more details about the events.

In January 2012, R.R. reported the incidents to the police. Detective Stephanie Bolks, a specialist in crimes-against-persons cases, investigated the report but was unsuccessful in her attempts to contact Reyes. M.C. was later interviewed by Mindee Rolles, a forensic interviewer. Reyes was charged with criminal sexual conduct in the second degree (victim under 16) (significant relationship), pursuant to Minn. Stat.

§ 609.343, subd. 1(g) (2010), occurring on or about May 1, 2010 through October 1, 2010, and criminal sexual conduct in the second degree (victim under 16) (significant relationship), pursuant to Minn. Stat. § 609.343, subd. 1(g) (2008), occurring on or about May 1, 2009 through October 1, 2009.[1]

At a pretrial hearing, the state requested permission, through the testimony of Rolles, to address why a child may delay reporting, what circumstances may lead to a child disclosing, and to whom a child may disclose. Reyes objected, arguing that this evidence would improperly bolster M.C.'s credibility. The district court reserved ruling on the issue, pending the presentation on foundation presented by the state.

At trial, the state called Rolles and Detective Bolks as witnesses, and both testified to behaviors and characteristics common in sexual-abuse-of-adolescent cases. The defense did not renew its objection to Rolles's testimony or object to Detective Bolks's testimony as improperly bolstering M.C.'s credibility. The jury found Reyes guilty of the two charges of second-degree criminal sexual conduct. This appeal follows.

## ISSUES

I.     Does a stepgrandfather-stepgrandchild relationship constitute a "significant relationship" as defined in Minn. Stat. § 609.341, subd. 15?

II.    Did the district court's decision to allow expert testimony regarding characteristics of minors who have been sexually abused constitute plain error?

---

[1] The relevant portions of the statutes did not change from 2008 to 2010, so although the actions for which Reyes was convicted may implicate both the 2008 and 2010 versions of the statutes, we cite only the 2010 statutes.

4

# ANALYSIS

## I.

Reyes argues that his second-degree criminal-sexual-conduct convictions must be reversed because a stepgrandfather-stepgrandchild relationship does not satisfy the significant-relationship element. Minn. Stat. §§ 609.341, subd. 15, .343, subd. 1(g). Interpretation of a criminal statute is a question of law that this court reviews de novo. *State v. Rucker*, 752 N.W.2d 538, 545 (Minn. App. 2008), *review denied* (Minn. Sept. 23, 2008). The objective of our statutory-interpretation analysis is to ascertain and give effect to the legislature's intent. *State v. Iverson*, 664 N.W.2d 346, 350 (Minn. 2003). "The first step in statutory interpretation is to determine whether the statute is ambiguous on its face." *State v. Jones*, 848 N.W.2d 528, 535 (Minn. 2014). A statute is ambiguous if its language is subject to more than one reasonable interpretation. *State v. Mauer*, 741 N.W.2d 107, 111 (Minn. 2007). Statutory construction is not permitted when legislative intent is "discernible from [the statute's] plain and unambiguous language." *Jones*, 848 N.W.2d at 535. Canons of interpretation and construction guide our analysis if the statutory language is ambiguous. *State v. Riggs*, 865 N.W.2d 679, 682 (Minn. 2015); *State v. Hayes*, 826 N.W.2d 799, 804 (Minn. 2013).

We are guided by several factors to ascertain legislative intent, including:

> (1) the occasion and necessity for the law;
> (2) the circumstances under which it was enacted;
> (3) the mischief to be remedied;
> (4) the object to be attained;
> (5) the former law, if any, including other laws upon the same or similar subjects;

(6) the consequences of a particular interpretation; [and]
(7) the contemporaneous legislative history[.]

Minn. Stat. § 645.16 (2016). Non-technical "words and phrases are construed according to rules of grammar and according to their common and approved usage." Minn. Stat. § 645.08(1) (2016). We also presume that "the legislature does not intend a result that is absurd, impossible of execution, or unreasonable," and that "the legislature intends the entire statute to be effective and certain." Minn. Stat. § 645.17(1)-(2) (2016).

Addressing the statutory language in question, a person is guilty of second-degree criminal sexual conduct if he or she "engages in sexual contact with another person" and "the actor has a significant relationship to the complainant and the complainant was under 16 years of age at the time of the sexual contact." Minn. Stat. § 609.343, subd. 1(g). A "significant relationship" is defined as a circumstance in which the actor is "any of the following persons related to the complainant by blood, marriage, or adoption: brother, sister, stepbrother, stepsister, first cousin, aunt, uncle, nephew, niece, grandparent, great-grandparent, great-uncle, [or] great-aunt." Minn. Stat. § 609.341, subd. 15(2). A stepgrandfather is not explicitly listed in the statute. *Id.*

Both parties maintain that a plain-meaning interpretation of "significant relationship" is appropriate because the definition in Minn. Stat. § 609.341, subd. 15, is unambiguous. But their plain-meaning interpretations are vastly different. Reyes asserts that "significant relationship" excludes stepgrandfathers because the statutory definition identifies a limited list of relationships using the phrase, "any of the following persons," and stepgrandfather is not one of the relationships that appears on the list. The state

6

contends that its reading of the statutory language distributes the phrase "related to the complainant by blood, marriage, or adoption" to all of the listed relationships. This interpretation includes stepgrandfathers because they are grandfathers related by marriage. We conclude that both of these interpretations are reasonable, and because the statute is susceptible to more than one reasonable interpretation, it is ambiguous. As a result, we turn to an examination of the legislative intent surrounding this statute.

The phrase "significant relationship" was added to the criminal-sexual-conduct statutes in 1985, when the legislature merged the crimes of criminal sexual conduct with the crimes of intrafamilial sexual abuse. *State v. Cook*, 617 N.W.2d 417, 419 (Minn. App. 2000), *review denied* (Minn. Nov. 21, 2000); *see also* 1985 Minn. Laws ch. 286, pmbl. The overall objective or purpose of the statute is to "prohibit[] intra-family sexual contacts." *State v. Williams*, 762 N.W.2d 583, 587 (Minn. App. 2009), *review denied* (Minn. May 27, 2009).

In *Williams*, we considered whether the definition of "significant relationship" included a half-brother. *Id.* at 585-87. Because the definition was "arguably ambiguous" in the context of a half-brother, we similarly considered legislative intent. *Id.* at 587. We concluded that it would be illogical "and contrary to the overall statutory purpose of prohibiting intra-family sexual contacts" to exclude half-brothers because "the law would then include step-brothers (with no blood relation) and cousins (genetically more distant than half-brothers) but exclude a brother related by half blood." *Id.*

Reyes's interpretation of "significant relationship" would similarly lead to an absurd result because it is contrary to the overall statutory purpose. A stepgrandfather is not

genetically related to a child, similar to a stepparent or stepsibling who are both listed in the definition of "significant relationship." Minn. Stat. § 609.341, subd. 15. But the legislature clearly intended to prohibit intra-familial sexual conduct, even among persons with whom the child has no blood relation. *See id.*; *Williams*, 762 N.W.2d at 587 (finding that stepbrothers are included in the definition even though they have no blood relation). Although the statute explicitly lists "great-grandparent, great-uncle, [and] great-aunt" in its definition of "significant relationship," these relationships may not be as intimate as the familial closeness between a stepgrandfather and a child. Minn. Stat. § 609.341, subd. 15(2). Here, M.C. testified that she saw Reyes one to three times per week and visited Reyes without her parents up to four times per month, which demonstrates that Reyes had a close familial relationship with M.C. Stepgrandfathers may also share a close familial relationship with a child, as is the case here. We conclude that stepgrandfathers are included in the definition of "significant relationship" because excluding stepgrandfathers would be absurd and contrary to the statute's purpose of prohibiting intra-family sexual contacts.

Reyes also contends that interpreting the statute to include stepgrandfathers creates superfluous terms. "A statute should be interpreted, whenever possible, to give effect to all of its provisions; no word, phrase, or sentence should be deemed superfluous, void, or insignificant." *State v. Perry*, 725 N.W.2d 761, 764-65 (Minn. App. 2007) (quotation omitted), *review denied* (Minn. Mar. 20, 2007). But the statute contains superfluous terms under both reasonable interpretations. If "significant relationship" only includes the relationships listed in the definition, then the language, "related to the complainant by

8

blood, marriage, or adoption" is superfluous. And if we interpret the statute to apply the phrase "related to the complainant by blood, marriage, or adoption" to the list of relationships, then "stepbrother" and "stepsister" are superfluous because the statute would already include brothers and sisters related to the complainant by marriage. Because the definition contains superfluous terms under both reasonable interpretations, the presumption that the legislature intended the entire statute to be given effect provides no guidance.

Reyes argues that if the statutory language is ambiguous, then the rule of lenity requires us to interpret the statute in his favor. But we only look to the rule of lenity if "a grievous ambiguity or uncertainty in the statute remains after we have considered other canons of statutory construction." *State v. Nelson*, 842 N.W.2d 433, 443 (Minn. 2014) (quotation omitted). Based on our analysis, the rule of lenity is inapplicable in this case.

For these reasons, we conclude that the statutory definition of "significant relationship" includes a stepgrandfather.

## II.

Reyes contends that Rolles's and Detective Bolks's expert testimony addressing general characteristics of minor victims of sexual abuse should have been excluded because it improperly bolstered M.C.'s credibility.

At a pretrial hearing, the district court heard arguments on the admissibility of the testimony of Rolles, who conducted a forensic interview of M.C. Rolles received her bachelor's degree in psychology and master's degree in social work, and she is a certified master social worker and a licensed mental-health practitioner in Nebraska. As a forensic

9

interviewer, Rolles is trained to speak with children about abuse in a neutral manner and has conducted approximately 750 interviews. At the hearing, the state requested that Rolles be permitted to testify to why a minor victim may delay reporting sexual abuse, what circumstances may lead to a minor disclosing, and who a minor may disclose to. Reyes objected to the proposed testimony, arguing that it "essentially works to explain or overcome any issues the State may have regarding credibility of the alleged victim" or "any issues or reasonable doubt . . . that may be present in the case." The district court reserved ruling on the objection, stating: "I have some concern about it as well, so what I want to do is reserve it. Let's see where you get foundationally with this witness, what the foundation is for that kind of testimony, and then I will decide there."

At trial, Rolles testified about her interactions with M.C., why a minor may disclose abuse at a certain time, and that the following characteristics were not unusual: the manner in which M.C. disclosed her sexual abuse, delayed reporting, family members as abusers, abuse occurring in the family home, and another person being present in the home during the abuse. Detective Bolks, a licensed officer who has been a police detective since 1994 and has investigated hundreds of sexual-abuse cases involving children, also testified for the state. Detective Bolks testified concerning her investigation, that people of all ages and occupations can be abusers, and that the following characteristics are common: delayed reporting, sexual abuse in the family home, and another adult's presence in the home during the abuse. At trial, Reyes did not renew his objection to Rolles's testimony and never objected to Detective Bolks's testimony.

When a party fails to object to the admission of evidence, we review an allegation of error under the plain-error standard. Minn. R. Crim. P. 31.02; *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). "The plain-error standard requires that the defendant show: (1) error, (2) that was plain, and (3) that affected substantial rights." *State v. Strommen*, 648 N.W.2d 681, 686 (Minn. 2002).

"The admissibility of expert testimony lies within the sound discretion of the trial court." *State v. Hall*, 406 N.W.2d 503, 505 (Minn. 1987). Expert testimony must be helpful to the jury to be admitted. *Id.* Even helpful evidence can be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury. *Id.; see also* Minn. R. Evid. 403. Generally, we "reject expert opinion testimony regarding the truth or falsity of a witness' allegations about a crime." *State v. Myers*, 359 N.W.2d 604, 611 (Minn. 1984). But expert testimony that adds precision or depth to the jury's ability to reach conclusions is admissible. *See State v. Helterbridle*, 301 N.W.2d 545, 547 (Minn. 1980). The supreme court has held that some evidence of the reporting conduct of adolescent sexual-assault victims and their continued contact with the assailant may be admissible, subject to the district court's discretion. *Hall*, 406 N.W.2d at 505.

In *Hall*, the district court permitted a clinical psychologist to testify to characteristics commonly exhibited by sexually abused adolescents, including why they commonly delay reporting the abuse and why they commonly have continued contact with the abuser. *Id.* at 504. The clinical psychologist had not interacted with the victim, so she did not testify to whether she observed any of these characteristics or conditions in the victim. *Id.* at 505.

11

The supreme court held that the district court did not abuse its discretion by admitting the testimony, stating:

> While we hold that in cases where a sexual assault victim is an adolescent, expert testimony as to the reporting conduct of such victims and as to continued contact by the adolescent with the assailant is admissible in the proper exercise of discretion by the trial court, we caution that we do not intend to establish a categorical rule that expert testimony concerning all characteristics typically displayed by adolescent sexual assault victims is admissible.

*Id.* The supreme court clarified that it would be reversible error for an expert witness to testify to the characteristics typically displayed by sexual-assault victims and to then opine that the victim had been raped or that the victim's behavior was consistent with rape trauma syndrome. *Id.* at 504-05 (citing *State v. McGee*, 324 N.W.2d 232 (Minn. 1982); *State v. Saldana*, 324 N.W.2d 227 (Minn. 1982)).

Here, the expert testimony is comparable to the testimony in *Hall*. The testimony of Rolles and Detective Bolks addressed the frequency of delayed reporting, abuse in the family home, and the involvement or presence of family members. While this testimony may have had an indirect effect on the jury's evaluation of M.C.'s credibility, that does not render the testimony inadmissible. *Myers*, 359 N.W.2d at 609. The question is not whether the testimony embraces the ultimate issue to be decided by the jury, but whether it "will help the jury to understand the evidence or to determine a fact in issue." *Id.* Because a jury may not have the foundation necessary to assess the credibility of a child who complains of sexual abuse, background information providing "relevant insight into the puzzling aspects of [a] child's conduct and demeanor . . . is helpful and appropriate in cases

12

of sexual abuse of children." *Id.* at 610. The opinion testimony of Rolles and Detective Bolks provided insight that helped the jury understand the delayed reporting and the circumstances of the abuse.

In contrast to *Hall*, Rolles and Detective Bolks did testify to their interactions with M.C. and her family members. But neither expert opined that M.C. had been abused or was truthful in her accusations. Because the opinion testimony was limited to whether certain characteristics were common in cases dealing with the sexual abuse of adolescents, we conclude that the testimony was within *Hall*'s parameters and that the district court did not err in admitting it.

## D E C I S I O N

Based on the canons of statutory construction, we conclude that a stepgrandfather is included in the definition of "significant relationship" under Minn. Stat. § 609.341, subd. 15. Because Reyes had a significant relationship with M.C. and because the district court did not err in admitting the expert testimony, we affirm the convictions.

**Affirmed.**